**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Gary Lee ELLERY, Defendant-Appellant.**

**No. 81–1906.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1982.

Decided May 11, 1982.

---

. . .

    . . . .

    shall be guilty of a felony . . . ."

Michael P. Carey, Carey, Cisco & Organ, Chicago, Ill., for defendant-appellant.

Richard L. Miller, Jr., Asst. U. S. Atty., Dan K. Webb, U. S. Atty., Chicago, Ill., for plaintiff-appellee; Robert Walter Tarun, Deputy Chief, Criminal Receiving and Appellate Division, Chicago, Ill., of counsel.

Before CUMMINGS, Chief Judge, BAUER, Circuit Judge, and DOYLE, Senior District Judge.[*]

BAUER, Circuit Judge.

After a bench trial, defendant-appellant Gary Lee Ellery was convicted on all three counts of an indictment charging him with various drug-related crimes. In his appeal Ellery challenges the trial court's denial of his motion to suppress certain evidence. He also challenges the sufficiency of the evidence supporting the trial court's guilty verdict. We affirm.

## I

Richard Hall was the owner-proprietor of Buckeye Chemical Company in Columbus, Ohio. On June 19, 1980, Hall's company received a letter from "Tom Thomson" requesting that five kilograms of norephedrine hydrochloride (HCL) be shipped in a plain brown box via United Parcel Service to a residential apartment at 445 West Wellington Street, Chicago, Illinois. Although the letter indicated that the purchase was for "laboratory or manufacturing purposes only," Hall became suspicious and

---

[*] The Honorable James E. Doyle, Senior Judge of the United States District Court for the West-ern District of Wisconsin, is sitting by designation.

alerted Drug Enforcement Administration (DEA) officials in Cincinnati.[1] The Cincinnati office, in turn, contacted DEA officials in Chicago.

Based on Chicago DEA Agent Lance Mrock's affidavit, the United States Attorney for the Northern District of Illinois filed an application seeking authorization to install and monitor an electronic beacon transmitter in the package bound for Thomson. Mrock's affidavit, in essence, asserted that a prepaid order of HCL—a non-controlled substance with no common household use, but an important ingredient necessary for manufacturing the controlled substance amphetamine—was being sent to a residential apartment building at the request of Thomson. No businesses appeared to be operating at the Wellington Street location, according to Mrock, nor was any residence or telephone listed in Thomson's name at that address.[2] The affidavit also alleged that the HCL was being used to commit a violation of 21 U.S.C. § 841(a)(1), that a high risk of detection existed if normal surveillance procedures were employed, and that the installation and monitoring of an electronic tracking device was therefore necessary to obtain evidence of the suspected drug offense. Attached to the affidavit was a copy of Thomson's letter. Concluding that probable cause had been established, United States Magistrate James Balog authorized the government to intercept the package and install a tracking device, known as a "beeper."[3]

After installing the beeper, government agents monitored the package's journey. On September 2, 1980, the HCL was delivered to the Wellington Street address, but no one responded to accept it. The next day the delivery service received directions to forward the HCL parcel to the Chicago office of Sargent & Lundy Company, where a person identifying herself as Inna Kudlova signed for and accepted the package.

Apparently the HCL remained with Kudlova until September 8, 1980, when government agents tracked the package to an apartment building at 5701 North Sheridan Road, Chicago. After obtaining management's consent to enter the building, the agents determined that the beeper's signal was emanating from apartment 28C, which was leased to defendant-appellant Ellery. Further government investigation revealed that in 1966 Ellery had been arrested and placed on probation for possession of marijuana and that in 1976 Ellery had purchased 200 ounces of ephedrine hydrochloride, an ingredient used in manufacturing a controlled substance called methamphetamine. In addition, upon reviewing the similar format of six letters by various individuals ordering chemicals from Hall's Buckeye Chemical Company, DEA agents concluded that the letters were authored by the same person.[4] The investigation also showed that Ellery was not licensed to manufacture or distribute pharmaceutical products.

Based on this information the government obtained a warrant from United States Magistrate Olga Jurco to search Ellery's apartment. The building manager allowed government agents to enter Ellery's quarters and conduct their search, resulting in the seizure of over 300 methaqualone tablets, three grams of pure, uncut methylenedioxy amphetamine (MDA), several chemicals which in combination produce phencyclidine (PCP), 14,424 capsules containing 5280.5 grams of ephedrine HCL cut with corn starch, and an additional 3059.5 grams of pure ephedrine HCL. Lit-

---

1. Hall, a paid government informant, was found murdered on September 7, 1980.

2. Apartment 90, the address specified in the Thomson letter, belonged to a person named Kudlova, an older woman with a daughter in college.

3. A "beeper" emits a signal which allows government agents to follow the movement of the object in which the beeper is secreted.

4. Three letters were sent by "George Morley," two by "Thomson/Kudlova," and one by "Jeff Brady." At trial Ellery admitted using the names George Morley, Tom Thomson, and John Randall to conceal his identity when ordering ingredients from Buckeye Chemical Company. It is unclear whether Ellery also employed the name Jeff Brady.

erature pertaining to chemical synthesis of controlled drugs and equipment used to produce such drugs were also seized.

A special grand jury subsequently returned a three count indictment against Ellery. The first count charged him with knowingly and intentionally possessing with intent to distribute approximately 210.84 grams of a mixture containing methaqualone, a controlled substance, in violation of 21 U.S.C. § 841(a)(1). The second count presented the same charge concerning the confiscated MDA, also a controlled substance. The third count accused Ellery of knowingly and intentionally attempting to manufacture PCP, another controlled substance, in violation of 21 U.S.C. § 841(a)(1). Ellery was convicted and sentenced. He now appeals.

## II

Ellery first attacks the government's use of the electronic beeper which led to his apartment and, ultimately, the discovery of his clandestine drug laboratory. He offers several theories in support of his basic position that his fourth amendment rights were violated. Ellery essentially claims that probable cause was not established to uphold the government's searches and that a lesser standard of "reasonable cause" is constitutionally forbidden. Specifically, Ellery argues that neither the search warrant for his apartment nor the order authorizing installation of the beeper were supported by probable cause. He also argues that the confiscated items were neither specified in the search warrant nor within plain view. We reject these contentions.

Probable cause for a drug laboratory search was examined in *United States v. Anton*, 633 F.2d 1252 (7th Cir. 1980), *cert. denied*, 449 U.S. 1084, 101 S.Ct. 870, 66 L.Ed.2d 808 (1981), where we said:

Probable cause exists when it is reasonably believed that the evidence sought will aid in a particular apprehension or conviction for a particular offense and that the evidence is located in the place to be searched. Probable cause denotes more than mere suspicion, but does not require certainty. It might be said to exist if it is more likely than not that evidence of the illegal activity will be found on the premises to be searched. The agents believed probable cause existed and they submitted the facts supporting their belief to the required neutral magistrate. The magistrate agreed with the agents and issued the warrant. The magistrate's determination is entitled to some deference from a reviewing court. *See Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969). In addition, because of the preference for warrants, a lesser showing may establish probable cause when a warrant is obtained than when a warrantless search is made. *See United States v. Ventresca*, 380 U.S. 102, 105–06, 85 S.Ct. 741, 744, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *Jones v. United States*, 362 U.S. 257, 270, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960).

*Id.* at 1254. A number of factors convinced us that sufficient probable cause existed in *Anton* to issue the search warrant, including Anton's use of a fictitious name in purchasing chemicals, a government chemist's opinion that certain chemicals known to be in Anton's house could be used to produce the controlled substance MDA, and a DEA agent's statement that no legitimate commercial or industrial activity appeared to be occurring at Anton's residence.

Many of the same factors are present here. For example, Agent Mrock's affidavit stated that (1) he had substantial experience in this type of investigation, having participated in approximately 75 cases involving illegal manufacture of controlled substances during his decade with the DEA; (2) no legitimate laboratory, manufacturing, or business enterprise appeared to be operating at the Wellington Street address; (3) the HCL shipped to that location lacked any common household use; and (4) the HCL could be used to manufacture amphetamine, a controlled substance. Indeed, in *Anton* the chemicals in question *might* have had household uses; here they

did not. Under these circumstances, the DEA's belief that illegal drug manufacturing was taking place was far more than a mere suspicion. Thus, Magistrate Balog's order authorizing installation of the beeper was founded on sufficient probable cause.[5]

■ Similarly, the search warrant for Ellery's apartment was also based on probable cause. After presenting the evidence previously before Magistrate Balog, the DEA demonstrated to Magistrate Jurco's satisfaction that Ellery had used the false name Tom Thomson in the letter ordering the HCL shipment from Buckeye Chemical Company, had received the HCL shipment, and had a prior conviction for possession of marijuana. The DEA also showed that similar drug purchases by a "George Morley" were in fact made by the same person masquerading as Thomson—Ellery—and that Ellery had purchased 200 ounces of HCL in 1976. These facts clearly established probable cause to search Ellery's apartment.

Finally, none of the evidence that was seized in plain view was offered or admitted during trial.[6] Ellery simply fails to connect this evidence with his conviction. Thus, Judge Shadur properly denied Ellery's motion to suppress.

### III

■ Ellery's second contention, that insufficient evidence supports his conviction, is also unpersuasive. Count One, charging possession of the controlled substance methaqualone with intent to distribute, was clearly proven. Approximately 300 methaqualone tablets were found in Ellery's apartment. When viewed in the light most favorable to the government, *Glasser v.*

*United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence sufficiently supports the inference that Ellery held the large number of tablets for distribution. His defense that the methaqualone was simply unused medication prescribed by his doctor is less than convincing, especially since Ellery in effect admitted possessing more tablets than his doctor had prescribed.[7]

Count Two was also proven beyond a reasonable doubt. Large quantities of HCL, cut and uncut, together with 23 bags of empty gelatin capsules and 80 capsules fully prepared for street sale, more than demonstrate illegal possession of MDA with intent to distribute.

Finally, Count Three was satisfactorily proven. In stipulated testimony a government chemist described the PCP manufacturing process. Referring to a substantial quantity of 1-piperdinocyclohexene discovered in a container in Ellery's apartment, the chemist characterized the substance as having no household, manufacturing, or common use, no intrinsic value by itself and, in the chemist's opinion, no use other than as an intermediate product in the synthesis of PCP.

In addition to this expert testimony, other evidence supported Count Three. The label on the 1-piperdinocyclohexene bottle, which said "Ready for P Toluenesulfonic Acid," corresponded to the next step in the PCP process. Further, Ellery was carrying two gallons of toluene as he entered his apartment during the search. In the synthesis of PCP, toluene is mixed with p-toluenesulfonic acid before such acid is combined with 1-piperdinocyclohexene. Also found in Ellery's apartment were nearly all

---

5. Because probable cause was present, we need not decide whether reasonable cause is sufficient for electronic tracking devices. *See United States v. Washington*, 586 F.2d 1147, 1154 (7th Cir. 1978).

6. These items included electronic devices, lock-picking tools and manuals, a stun gun, loaded revolvers, badges, and false identification cards.

7. Judge Shadur observed:

Assuming the facts most favorable to Ellery (14 months of 30-tablet prescriptions, less the minimum 10 tablets per month used during the prescription period and less 50 tablets used during a year after Ellery last saw Dr. Calloway [it would be twice that if the period were two years]), the calculations would produce a remaining accumulation of 230 tablets—far short of the 300 tablets actually seized and in evidence.

the chemicals necessary to complete the synthesis of PCP, six different documents detailing the intermediate process of synthesizing PCP, and notes to the same effect. Finally, the trial court noted that the absence of ordinary living amenities in Ellery's apartment stood in sharp contrast to the quantity of facilities related to drug manufacturing activities.

This overwhelming evidence amply justifies the trial court's finding of guilt on all three counts. Indeed, a fair review of the government's proof suggests that Ellery was nearer to a wholesale supplier of drug store chains than to a mere chemist tinkering with his toys.

### IV

For the reasons expressed in this opinion, the trial court is

AFFIRMED.