UNITED STATES of America,
Plaintiff-Appellee,
v.
Kevin SWEENEY, Daniel Hughes and
Robert Ellington,
Defendants-Appellants,
and
UNITED STATES of America,
Plaintiff-Appellant,
v.
Daniel M. HUGHES, et al.,
Defendants-Appellees.

Nos. 81–1021, 81–1057, 81–1058,
81–1051 and 81–1268.

United States Court of Appeals,
Seventh Circuit.

Argued June 11, 1982.

Decided Sept. 15, 1982.

Rehearing and Rehearing In Banc
Denied Jan. 26, 1983.

William D. Stiehl, Jr., Stiehl & Hess, William D. Stiehl, Sr., Amiel Cueto, Belleville, Ill., for defendants-appellants.

Marsha L. Johnson, Asst. U.S. Atty., James R. Burgess, Jr., U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before PELL and COFFEY, Circuit Judges, and EAST,* Senior District Judge.

COFFEY, Circuit Judge.

These are appeals from the judgments of the United States District Court for the Southern District of Illinois and the United States District Court for the Southern District of Indiana. Affirmed in part, reversed in part.

This case represents the consolidated appeal of several rulings by the District Court for the Southern District of Illinois and the District Court for the Southern District of Indiana. The defendants-appellants herein, Daniel Hughes, Kevin Sweeney, and Robert Ellington, were found guilty of conspiracy to manufacture and distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 846. Appellant Sweeney was also found guilty of conspiracy to manufacture and distribute phencyclidine (PCP) and appeals his conviction on that count. Appellant Hughes also appeals from an order of the court denying his motion to suppress the evidence seized during a search of his home in Indiana. The United States Government cross appeals from an order of the district court granting defendant Hughes' motion for return of $7,500 seized during the search of his house and from an order of the District Court for the Southern District of Indiana suppressing the introduction of the shotgun as evidence also seized in Hughes' house during the same search. Federal law prohibits the possession of a shotgun having a barrel of less than eighteen inches in length in section 26 U.S.C. §§ 5861(d), 5871.

A Grand Jury in the Southern District of Illinois returned an indictment on August 22, 1980 against sixteen individuals for their participation in two drug conspiracies, one for the manufacture and distribution of phencyclidine (PCP)[1] and one for the manufacture and distribution of methamphetamine.[2] Except for the three appellants herein, the other individuals charged either pleaded guilty or were granted immunity for their testimony at the trial of the remaining defendants.

Evidence presented at trial revealed that defendant-appellant Sweeney was the key or central figure in the drug manufacturing

---

* Honorable William G. East, Senior District Judge for the District of Oregon, is sitting by designation.

1. Phencyclidine (PCP) is designated as a Schedule II controlled substance. 21 U.S.C. § 812. See also 21 C.F.R. § 1308.12(e)(4).

2. Methamphetamine is designated as both a Schedule II and a Schedule III controlled substance. 21 U.S.C. § 812. See also 21 C.F.R. §§ 1308.12(d)(2), 1308.13(b).

conspiracies involving both PCP and methamphetamine. During the first six months of 1975, Sweeney, after conducting a certain amount of research, decided to manufacture the illegal drug PCP. In early 1976, Sweeney began manufacturing an orange powder that he said was PCP both at his home and at his parents' home in the country, and shortly thereafter began selling the orange powder product. At about this time he began to involve several other individuals, either as the sellers of his manufactured PCP, or as his front people to aid in the acquisition of chemicals and apparatus needed to produce the drug.

In 1977, while continuing to manufacture PCP, Sweeney decided to expand his business enterprise, started experimenting in the making of methamphetamine, and began phasing out his PCP activities due to the adverse publicity concerning the dangers of PCP and the police interest in arresting PCP manufacturers. Several of the same persons involved in the PCP conspiracy assisted Sweeney in the manufacture and distribution of the methamphetamine. In particular, appellant Ellington aided in the conspiracy by purchasing in Indiana and Texas the chemicals and apparatus necessary to manufacture both PCP and the methamphetamine. Ellington also delivered the final product to those who eventually sold the drugs. Appellant Hughes aided Sweeney in the manufacture of the drugs in Hughes' home in southern Indiana and acted both as a seller and a distributor of the PCP and the methamphetamine.

On October 27, 1980, a trial to the jury began against five of the defendants charged with a conspiracy to manufacture and distribute PCP (Count I) and a conspiracy to manufacture and distribute methamphetamine (Count II). During trial, two of the individuals charged in the indictment pleaded guilty to the charges contained in the indictment, and later testified against the remaining defendants. Count I was dismissed against appellant Hughes. On November 19, 1980 the jury rendered a guilty verdict against appellant Sweeney as to both counts. Appellant Hughes was found guilty as to Count II and appellant Ellington was found guilty as to Count II and not guilty as to Count I.

In what can be termed a "shotgun" approach appellant Sweeney alleges a combination of twenty-six instances of error in his trial and in the Grand Jury proceedings which originally led to his indictment. Appellant Ellington alleges fifteen instances of error, many identical to the issues raised by appellant Sweeney. Appellant Hughes also raises fifteen instances of error. These issues will be addressed individually below and further facts will be developed which are necessary to the resolution of these issues.

1. Validity of Search Warrant.

In August of 1980, two Drug Enforcement Administration Agents, Hubert R. Coleman and Gregory McCoy, accompanied by a Gibson County Sheriff, went to appellant Hughes' residence in Gibson County, Indiana to serve a federal grand jury subpoena upon Hughes. At the time these individuals arrived to serve the appellant with the subpoena, appellant Hughes was absent from the home. However, a housekeeper answered the door, and while the housekeeper was informing the DEA Agents that the appellant was not at home, one of the agents, Agent Coleman, an agent experienced in the drug field, while standing at the front door smelled an odor which the agent later identified as the odor of methylamine being processed into methamphetamine. Methylamine is one of the compounds used in the production of methamphetamine. Several of the other Drug Enforcement Agents remained at the home of the appellant Hughes and Agent Coleman proceeded to the local state court where he swore out an affidavit in support of a search warrant.

In his affidavit, Agent Coleman recited that he was a Special Agent for the DEA and had been employed as an agent for the past ten years. Agent Coleman further recited that he was the Agent In Charge of an investigation into clandestine laboratories and that during the course of this investigation it had become apparent that Daniel Hughes was a co-conspirator in a large scale conspiracy to manufacture and distribute methamphetamine. The agent stated that he had smelled the unmistak-

able odor of methylamine while attempting to serve a federal subpoena on Daniel Hughes, and that due to his familiarity with the odor of chemicals used in the manufacture of methamphetamine, Agent Coleman was able to state that the unmistakable odor was known as methylamine and phenyl-two-propnone to his olfactory sense. Finally, in the affidavit Agent Coleman stated that Daniel Hughes' son was arrested in June of 1977 in possession of two bags of methamphetamine. Based upon this affidavit, a search warrant was issued by Gibson County Magistrate John C. Hicks.

Agent Coleman returned to appellant Hughes' residence and discovered that Hughes had returned in his absence. After Hughes was served with the search warrant and the subpoena the law enforcement officers began their search of his home. The search produced a number of items of glassware which were admitted at the trial, a shotgun with a barrel length of less than eighteen inches, and $7,000 in cash found in the appellant Hughes' safe. The agents also seized $500 from Hughes' wallet.[3] The agents further found some strainers (sifters) with traces of chemicals which were later identified as methamphetamine.

Appellant Hughes filed a motion in the District Court for the Southern District of Illinois to suppress the glassware and the sifters[4] containing the traces of methamphetamine. The Honorable William L. Beatty, District Judge, held an evidentiary hearing and denied appellant Hughes' motion, ruling that the glassware and the sifters containing traces of methamphetamine were admissible in Hughes' trial on the alleged conspiracy to manufacture and distribute methamphetamine. Hughes appeals from this denial of his motion to suppress.

Hughes was also indicted in the Southern District of Indiana for the unlawful posses-

sion of a shotgun with a barrel of less than eighteen inches in violation of 26 U.S.C. §§ 5861(d), 5871. Appellant Hughes also made a motion to suppress the shotgun in the Southern District of Indiana based upon the same reasoning which had been previously rejected by Judge Beatty in Illinois. The Honorable Gene E. Brooks of the District Court of the Southern District of Indiana, even though being apprised of Judge Beatty's decision in Illinois, found the government's search to be illegal and granted the motion to suppress on the grounds that Agent Coleman's smelling of the odor alone was insufficient to establish probable cause and that the other aspects of the affidavit were conclusory in nature.[5] The government cross-appeals from this order suppressing the shotgun.

■ After a careful examination of the affidavit, we hold that because the affidavit submitted by Agent Coleman when read in its entirety satisfactorily established Agent Coleman's expertise in identifying the chemicals used to manufacture methamphetamine by their distinctive odor and further recited that Agent Coleman had smelled this odor at appellant Hughes' residence, and when read together with the other information contained in the affidavit which we hold was not conclusory in nature but based upon articulated facts, the affidavit established a sufficient basis from which a detached magistrate could find probable cause for the issuance of a valid search warrant. Therefore, the decision of the District Court for the Southern District of Illinois is affirmed, and the decision of the District Court for the Southern District of Indiana suppressing the evidence obtained by Agent Coleman is reversed.

■ Appellant Hughes challenges the search warrant issued by the Gibson County Magistrate by challenging the affidavit

---

**3.** The money which was seized from the safe and from Hughes' wallet was never introduced as evidence in the conspiracy trial. The shotgun which was seized formed the basis of the charges brought against Hughes in Indiana.

**4.** These "sifters" were apparently used in processing the methamphetamine.

**5.** The trial court in Indiana found that Agent Coleman's assertion that during the course of his investigation into clandestine laboratories it had become apparent that Hughes was a co-conspirator in a large conspiracy to manufacture methamphetamine was "purely conclusory in nature." Thus the only allegation Judge Brooks found relevant was the agent's detection of the odor.

which underlies the search warrant, and thereby challenges the validity of the search itself. The appellant contends that Agent Coleman's allegation of unmistakable odor could not constitute probable cause for the issuance of a search warrant because methylamine is not listed as a controlled substance. Moreover, the appellant contends that there was a misrepresentation of material fact in the affidavit in that the agent averred that he smelled methylamine but no methylamine was found in the house and therefore the evidence should have been suppressed. Finally, appellant Hughes contends that Agent Coleman made an intentional or reckless misrepresentation of fact before the Magistrate because the agent stated he had smelled methylamine when he knew or recklessly disregarded the fact that the smell he detected was not "unmistakably" methylamine and thus the evidence should have been suppressed by the trial court.

The essential test for determining whether the detection of an odor establishes sufficient probable cause for a search warrant was set forth by the Supreme Court in *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). While the detection of odors alone does not authorize a search without a warrant, "if the presence of odors is testified to before a Magistrate and he finds the affiant qualified to know the odor and [the odor] is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant. Indeed it might well be found to be evidence of most persuasive character." *Id.* at 13, 68 S.Ct. at 369. Thus, *Johnson* establishes a two-prong test to be applied when determining whether the detection of an odor can give rise to sufficient probable cause to issue a search warrant: (1) the affiant must be qualified to know, recognize and be able to identify the odor; and (2) the odor must be sufficiently distinctive to identify a forbidden substance. In view of the fact that the instant affidavit identified Agent Coleman as qualified to identify the substance and because the odor Agent Coleman detected

was sufficiently distinctive to identify the forbidden activity of the manufacture of methamphetamine, we hold that the affidavit in the instant case was sufficient to meet the *Johnson* test.

 As a general rule, probable cause exists when within the knowledge of the agents, certain facts and circumstances would lead a man of reasonable caution to believe that a crime is being committed or is about to be committed or that seizable property can be located at the premises in question. *See generally United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965); *Carrol v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). This court has recently had the opportunity to review the standards of probable cause as they relate to drug laboratory searches. In *United States v. Ellery*, 678 F.2d 674 (7th Cir. 1982), Judge Bauer, citing *United States v. Anton*, 633 F.2d 1252 (7th Cir. 1980), *cert. denied*, 449 U.S. 1084, 101 S.Ct. 870, 66 L.Ed.2d 808 (1981), noted that:

Probable cause exists when it is reasonably believed that the evidence sought will aid in a particular apprehension or conviction for a particular offense and that the evidence is located in the place to be searched. Probable cause denotes more than mere suspicion, but does not require certainty. It might be said to exist if it is more likely than not that evidence of the illegal activity will be found on the premises to be searched. The agents believed probable cause existed and they submitted the facts supporting their belief to the required neutral magistrate. The magistrate agreed with the agents and issued the warrant. The magistrate's determination is entitled to some deference from a reviewing court.

*Ellery*, 678 F.2d at 677.

 Applying the above test of reasonableness, Agent Coleman detected and recognized an odor, peculiar and identifiable to the manufacture of methamphetamine, at the residence of Hughes which he, through his prior vast experience, reasonably associated with the manufacture of methamphetamine. Moreover, because we hold that

Agent Coleman was qualified because of extensive prior experience to recognize odors associated with the manufacture of methamphetamine and, as stated in the affidavit, had been a Special Agent for the DEA for ten years and had been in charge of a clandestine laboratory investigation, the statements, observations, and knowledge and experience of Coleman clearly meet the requirements of the *Johnson* test. He recited in the affidavit that he had executed numerous search warrants involving clandestine operations and was intimately familiar with the odor of chemicals used in manufacturing methamphetamine. Moreover, he recited that he had attended a twelve week narcotic school and had lectured on clandestine operations to other law enforcement personnel. Therefore, we hold that Agent Coleman's experience in the investigation and detection of clandestine laboratory operations and the recitation of his familiarity with the detection of the odors associated with the production of methamphetamine was sufficient to form the basis of probable cause for the search warrant to issue.

■ We also disagree with the Southern District of Indiana trial court's suppression of the shotgun on the grounds that the smell of methylamine is not distinctive enough to distinguish between methylamine and other similar household products. The appellants contended and Judge Brooks found that methylamine does not have an unmistakable odor and that therefore there was a misrepresentation by Agent Coleman. However, according to Agent Coleman's testimony at the suppression hearing, the agent stated that it was not necessarily the smell of the methylamine alone which gave rise to his suspicion that defendant Hughes was engaged in the manufacture of methamphetamine, but rather it was the odor which occurs with the mixing and combination of methylamine and P2P, which when having reacted together create what is known as methamphetamine. In response to questioning, Agent Coleman testified:

> I was very sure about it and I was under oath at the time of the affidavit and I am under oath now and I was sure of it as I am sitting here, I smelled it many times and it is unmistakable. If I walk into a room where they were cooking speed [methamphetamine] I could tell you what was going on. . . . I smelled an odor that I had smelled on numerous occasions when I dealt with methamphetamine, purchased it, and I smelled an odor that I recognized to be associated with methamphetamine.

Thus, Agent Coleman was actually describing the odor of the combination of methylamine and phenyl-two-propnone (P2P) into the compound of methamphetamine when he stated in his affidavit "the odor is more specifically described as methylamine and phenyl-two-propnone (P2P)." Therefore, based upon Coleman's recognition of the odor, his experience with and knowledge concerning clandestine drug laboratories, his description of the odor of the compound methamphetamine, coupled with his statement concerning his expertise in the area of drug odor detection, and combined with the other information contained in the affidavit, we find that there was sufficient probable cause for a search warrant to issue by the Gibson County Magistrate, and therefore we hold that the glassware and other items seized during this search were admissible at Hughes' trial on the conspiracy charge and that Judge Brooks erred when he suppressed the shotgun which was seized during this lawful search.

2. Grand Jury Proceedings.

Appellants Sweeney and Hughes assert that the Grand Jury was misled in its deliberation by the prosecution's omission of any admonition about the veracity of witnesses before the Grand Jury when it returned the indictment charging the defendants with a conspiracy to manufacture and distribute PCP and methamphetamine. Essentially, the appellants contend that the prosecutor should have informed the Grand Jury of the potential biases of various witnesses who testified before the Grand Jury, and further, that it was error for the prosecution to present extensive hearsay testimony to the Grand Jury, and for the Grand Jury to base its indictment upon this hearsay testimony. We find the appellant's argument without

merit because our review of relevant case law reveals that it is proper for a Grand Jury to base its indictment upon hearsay testimony and the conduct of the prosecution during the Grand Jury proceedings was not so egregious as to warrant reversal. *See generally United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) and *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

▪ Initially, it should be noted that the appellants raise the issue of prosecutorial misconduct before the Grand Jury for the first time on appeal. When an appellant fails to attack the Grand Jury proceedings at the trial level, the appellate court will consider the issue only upon a showing of "plain error." F.R.Crim.P. 52(b). After a careful review of the record and the relevant case law we find that the conduct of the prosecution and the introduction of hearsay evidence to the Grand Jury was within settled principles of law and therefore no plain error exists here.

"Traditionally the Grand Jury has been accorded wide latitude to inquire into violations of criminal law.... The Grand Jury's investigative power must be broad if its public responsibility is adequately to be discharged.... The Grand Jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered." *Calandra,* 414 U.S. at 343–45, 94 S.Ct. at 617–18. Indeed, it is well settled that a court will not uphold a challenge to the defendant's indictment on the grounds that "only hearsay evidence was presented to the Grand Jury which indicted him," *Costello,* 350 U.S. at 359, 76 S.Ct. 406, or that the Grand Jury was not fully informed on the credibility of witnesses. *United States v. Thompson,* 576 F.2d 784, 786 (9th Cir. 1978). Therefore, we hold that since it is proper to allow a Grand Jury to consider hearsay evidence and since it is also proper to allow the Grand Jury to base its indictment upon hearsay testimony no plain error existed in the Grand Jury's proceedings and therefore no grounds for reversal exist.

3. Pre-Indictment Delay.

The appellants allege that because the PCP conspiracy related to acts which began in 1975, and because the indictment was not returned against the defendants until August 22, 1980, the appellants were prejudiced in not being able to secure and locate defense witnesses, in defending against the loss of original documents, and in reconstructing events which occurred within the past five years. The appellants assert that this pre-indictment delay should have been addressed by the trial court in a hearing. We disagree with the appellants because the appellants have not established to the trial court's nor to this court's satisfaction that they were prejudiced by the delay.

The indictment alleged two separate conspiracies. The first conspiracy was to manufacture PCP, beginning in March of 1975 and ending in May of 1978. The second conspiracy was to manufacture and distribute methamphetamine, beginning in May of 1978 and terminating with the date of the indictment, August 22, 1980. Drug Enforcement Administration Agents testified that they commenced their investigation in late 1979 or early 1980, while the local police authorities began their investigation in late 1978, thus revealing a combined effort of law enforcement agencies in excess of two years. Indeed, evidence adduced at trial reveals that illegal activities were being committed by the defendants as late as March, 1980.

▪ Because both conspiracies were prosecuted within the statutory time limit of five years, 18 U.S.C. § 3282, to be granted relief based upon pre-indictment delay, the defendants must establish that they were actually prejudiced by the delay, that the delay was unnecessary, and further that there was an ulterior motive on the part of the prosecution to interfere with the defendants' trial. *See United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977) and *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). While there appears to be some delay between the acts committed by the defendants and the issuance of the indictment, the delay was not the result of prosecutorial misconduct, but rather arose because of the continuing nature of the investigation, and did not prejudice the

appellants as it did not result in the lack of availability of witnesses nor did it interfere with the defendants' defense. Therefore, we hold that the pre-indictment delay in this case does not rise to the level of grounds for reversal.

4. Motion To Dismiss Counts I & II.

■■■ The appellants assert that the government did not allege all the essential elements of the crimes with which the appellants were charged. However, because of the "buckshot" nature of appellants' allegations of error, it is difficult to ascertain and indeed the appellants have failed to identify which elements were missing, and our thorough review of the record substantiates that the government did indeed allege and prove all of the elements required to sustain a violation of 21 U.S.C. §§ 841(a)(1), 846. In light of the poorly articulated challenge to the government's indictment and the language of the indictment itself, we disagree with the defendants' position and affirm the findings of the trial court that the allegations contained in the indictment were sufficient to sustain the charges that the defendants conspired to manufacture, distribute and sell PCP and methamphetamine.

The essential elements of conspiracy under section 846 are the existence of an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substance Act. Indeed, case law reveals that "an indictment under 21 U.S.C. § 846 is sufficient if it alleges a conspiracy to distribute drugs, the time during which the conspiracy was operative and the statute allegedly violated, even if it fails to allege any specific overt act in furtherance of the conspiracy." *United States v. Bermudez*, 526 F.2d 89, 94 (2d Cir. 1975), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). Under this standard, the indictment in the instant case is sufficient because it specifically alleges the type and nature of the statute involved, the conspiracy and the time period of the conspiracy. Therefore we agree with the trial court's denial of the appellants'

motion to dismiss Counts I and II of the indictment.

5. Severance.

Appellant Sweeney contends that the trial court erred when it refused to sever appellant Hughes' trial from that of appellants Sweeney's and Ellington's trial. The appellant argues that the government failed to prove an adequate relationship between the activities of defendants Sweeney and Hughes and thus should not have prosecuted both as part of the same conspiracy. The appellant argues that the activities and proof which led to the conviction of defendant Hughes were independent and unrelated to the activities and proof of conspiracy upon which Sweeney's conviction was based. Again, because a sufficient connection between the defendants was established by testimony at trial that Hughes aided Sweeney in the manufacture, distribution and ultimate sale of the methamphetamine and because the same evidence was admissible against each of the defendants, we find no merit to the defendants' arguments.

■■■ Initially, the issue of severance is again argued for the first time on appeal, and was not made prior to trial or renewed during trial and therefore is reviewable only if plain error occurred. Fed.R.Crim.P. 52(b). No such error exists here.

Generally, where the indictment charges a conspiracy, or a crime having a principal and aider-abettors, the rule is that persons jointly indicted should be tried together. And where proof of the charges against the defendants is dependent upon the same evidence and alleged acts, as is the case when the charged relationship of the defendants is principal-aider-abettor, severance should not be granted except for the most cogent reasons.

*United States v. Kahn*, 381 F.2d 824 (7th Cir. 1967), *cert. denied*, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1968).

■■■ Appellant Sweeney argues that had the trial court suppressed the glassware seized during the search of Hughes' resi-

dence, the connection between Hughes and the glassware would have been absent at trial. Sweeney takes the position that since the glassware was nonetheless used as evidence at trial, he was prejudiced by the glassware's introduction into evidence. This argument approaches the absurd. The trial court denied the motion to suppress, and this court has affirmed. See *infra* part 1. Thus, the introduction of the glassware into evidence did not prejudice Sweeney's rights.

 Therefore, because there was a sufficient connection established in the testimony at trial of an interconnection between appellants Sweeney and Hughes in that they joined together and conspired to manufacture and distribute methamphetamine, and because the same evidence was admissible against all three defendants, we hold the trial court's ruling was proper in denying the appellant's motion for severance.

6. Production of Information.

The appellants urge that the prosecution had failed to satisfy its obligation to disclose and produce information as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, the appellants allege that the government failed to disclose information relating to the medical records of two of the original co-conspirators' drug addiction problems. Additionally, the appellants allege that the government failed to disclose the record of money payments made to Tracy White, a paid government informer who was used during the investigation of this case, and who testified against the defendants at trial. It is the appellants' position that they were unduly prejudiced by the government's failure to produce this information prior to trial. We disagree.

 *Brady* states that:
[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1960). Thus *Brady* mandates that the evidence must be disclosed if it is either material to the guilt or to the punishment of the accused. Evidence favorable to the accused includes material which tends to be exculpatory and material which might be used to impeach a government witness. However, the evidence referred to by the defendant does not require reversal under *Brady* because *Brady* does not require *pre-trial* disclosure of the materials. "The appropriate standard to be applied . . . is whether the disclosure came so late as to prevent the defendant from receiving a fair trial." *United States v. McPartlin*, 595 F.2d 1321, 1346 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). Our review of the record fails to establish that the appellants herein have been prejudiced by the government's failure to release evidence.

 As noted above, the appellants complain that the nondisclosure of evidence relating to the drug use of several government witnesses was prejudicial in that the appellants would have used this information to impeach the witnesses. However, a review of the transcript indicates that the government witnesses and informers were extensively examined by the government and cross-examined by defendants' counsel concerning their drug use, and as to their deals with the government. Thus, we fail to understand how the defendants can now contend that the nondisclosure prejudiced the defendants or how the defendants would have used the material for impeachment purposes during cross-examination. The defendants were not prejudiced because they were able to introduce evidence relating to the witnesses' drug addiction and their deals with the government. Moreover, the transcript from an earlier trial was available to the defense, and this also benefitted the defendants in that they were able to utilize this transcript and conduct extensive cross-examinations of these witnesses. Indeed, during the cross-examination of Tracy White, the appellants extensively questioned White concerning his testimony in an earlier trial and the inter-

vention by Drug Enforcement Administration Agents in a state court proceeding against White. Thus, the release of information concerning White's prior participation with DEA Agents would not have provided the appellants with any more information concerning this witness' drug use or credibility than would have been revealed from a review of the earlier trial transcript or what they ultimately elicited from White during cross-examination. Therefore, because the defendants were able to introduce evidence relating to these witnesses' drug addiction and their deals with the prosecution and because the failure to release the type of evidence complained of by the defendants does not rise to such a level as to constitute a denial of due process we hold that the appellants were not denied impeachment material by the failure of the prosecution to make this information available.

**7. Admissibility of Evidence.**

In November of 1979, the Drug Enforcement Administration was conducting an investigation into activities involving a drug paraphernalia store and its owners Bob and Sandy Thomas. On November 21, 1979, Buckeye Scientific of Ohio, a firm engaged in the sale and distribution of chemicals (specifically those used to manufacture drugs), notified the DEA that Sandy Thomas of Mandala, a drug paraphernalia store, had ordered fifteen kilograms of methylamine, a substance used in the manufacture of methamphetamine. The DEA arranged for this order to be sent from Buckeye Scientific to their headquarters (DEA's) in St. Louis. On November 30, 1979 a court order was issued authorizing the transfer of the methylamine into a five gallon drum containing a beeper,[6] and further authorizing the monitoring of this beeper. An undercover agent, dressed as a United Parcel Service delivery man, delivered this five gallon drum, the property of the DEA, to Mandala on November 30, 1979. The DEA

continued monitoring this beeper and on December 2, 1979 both visual surveillance and beeper transmission revealed a change in location of the drum containing the methylamine from the drug paraphernalia shop to the residence of an individual named Joe Kennedy. The DEA continued monitoring the beeper transmissions until the battery went dead, and these monitorings revealed that there were no further movements of the five gallon drum.

The appellants allege that the district court improperly refused to suppress testimony relating to the beeper located in the drum inside of the Kennedy home. The appellants assert that their fourth amendment rights to be free from unreasonable search and seizure were violated by the placement of the beeper within the five gallon drum. The appellants further assert that the government was under a duty to produce electronic surveillance records pertaining to the lawfulness of the beeper and failed to do so. We find the appellants' position without merit because the placement of a "beeper" is governed by the fourth amendment and not by laws relating to electronic surveillance, *United States v. Ellery*, 678 F.2d 674 (7th Cir. 1982), and because the appellants' fourth amendment rights were not violated.

█ The appellants are mistaken in their contention that a beeper is governed by 18 U.S.C. § 2510 *et seq.*, which regulates the interception of wire and oral communications and requires the government to produce electronic surveillance records and evidence of the lawfulness of the interception of the communication. It is fairly well settled that beepers are governed by the laws of search and seizure, and not the laws concerning electronic surveillance. *See, e.g. Ellery*, 678 F.2d at 676, 677; *United States v. Washington*, 586 F.2d 1147 (7th Cir. 1978). Therefore, the defendants' argument with respect to the placement of the "beeper" rests solely on fourth amendment grounds.[7]

---

**6.** A "beeper" is an electronic device which transmits signals on a specific frequency and is

used by law enforcement officials as an electronic tracking device.

**7.** In a recent Eighth Circuit decision, the court,

Recent Supreme Court cases have reaffirmed the fact that in order to challenge the validity of a search under the fourth amendment the aggrieved party must establish standing. The appellants herein must establish that the challenged search violated their fourth amendment rights, in that they had a legitimate expectation of privacy in the area searched. *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). In the instant case, the appellants have argued neither a proprietary nor a possessory interest in the methylamine, in the five gallon drum, in the drug paraphernalia store or in the residence of Joe Kennedy where the drum was housed. Thus, upon a careful examination of the record, we hold that the appellants have failed to establish a "legitimate expectation of privacy" and lack standing to challenge the validity of the search and seizure.

### 8. Variance of Proof.

The appellants contend that the proof at trial demonstrated that there were actually a number of conspiracies relating to the production of methamphetamine, and not simply the one conspiracy charged in Count II of the indictment. The appellants allege that the government's proof at trial established not one conspiracy alone between appellant Sweeney and all of his "underlings" but rather a number of separate and distinct individual conspiracies between Sweeney and others to manufacture and distribute the methylamine. Our review of the record reveals that one underlying thread of conspiracy existed between Sweeney, Hughes, Ellington and their underlings to manufacture, distribute and sell methamphetamine and therefore we hold that the proof at trial was sufficient to establish a conspiracy to manufacture, distribute and sell methamphetamine as charged in Count II of the indictment.

Contrary to the appellants' position the government has sufficiently proved that the conduct of the co-conspirators and witnesses was interrelated and thus in actuality was a part of the one and the same overall conspiracy scheme to manufacture and distribute methamphetamine. After examining all the evidence in the light most favorable to the government, we find that one continuous conspiracy existed with appellant Sweeney as the primary manufacturer of methamphetamine and Hughes and Ellington, as well as the other appellants and co-conspirators, who were used to assist in the manufacture, the distribution as well as the ultimate sale of the methamphetamine. Therefore, we agree with the findings of the trial court that the proof admitted at trial established one conspiracy to manufacture, distribute and sell methamphetamine as charged in Count II of the indictment.

### 9. Evidence of Glassware.

During the search of appellant Hughes' house, various pieces of glassware were seized under the theory that although these items when discovered were camouflaged as being used for the seemingly innocuous purpose of planters, when in actuality they were being used in the manufacture of methamphetamine. The defendant moved for a protective order prohibiting the introduction of these items of glassware on the grounds that with the exception of the two sifters, none of the items of glassware had been found to contain methamphetamine. Furthermore, since the items seized had been used as bar glasses, flower vases and decorations, and were spread all over the house, none of the glassware could have been set-up into any kind of apparatus for the manufacture of methamphetamine.

---

in overturning the decision of the trial court, found that surveillance by law enforcement officials of the defendants by the use of a "beeper" violated the defendants' fourth amendment rights. *United States v. Knotts*, 662 F.2d 515 (8th Cir. 1981). The Supreme Court has granted *certiorari*. ⸺ U.S. ⸱⸱ ⸱ , 102 S.Ct. 2956, 73 L.Ed.2d 1348 (1982). However, because the

Eighth Circuit's decision was grounded upon the fact that the government failed to obtain a warrant, and because the beeper in this instant case was placed into the five gallon drum pursuant to a court order and because the court order is not under attack here, the Eighth Circuit decision is not controlling here.

The defendant argues that since no nexus existed between the glassware and the alleged conspiracy, therefore the glassware was irrelevant to prove that he conspired to manufacture methamphetamine. The trial court denied the defendant's motion to prohibit the introduction of the glassware at trial, and we affirm.

■ Evidence is deemed "relevant" and is therefore admissible at trial if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Broad discretionary powers in determining the relevancy of evidence is vested with the trial court, and the court has the duty of balancing the probative value of any evidence against any prejudice when determining the issue of admissibility. See, e.g., Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Thus, the finding of the trial court on the admissibility of the glassware seized in appellant Hughes' home will be reversed only upon a finding of abuse of discretion on the part of the trial judge. We agree with the finding of the trial court and hold that the trial judge did not abuse his discretion in ruling that the glassware was admissible.

■ Appellants herein are charged with the conspiracy to manufacture, distribute and sell methamphetamine. A number of witnesses testified at trial that appellant Hughes had participated with the other co-conspirators to manufacture and distribute methamphetamine as charged in the indictment. It is readily apparent from the testimony adduced at trial that the glassware which was seized from defendant Hughes' home could be readily assembled into an apparatus used in the manufacturing and processing of methamphetamine. These items therefore combined with all of the other evidence adduced at trial lend credence to the government's position that appellant Hughes was directly involved in the overall conspiracy to manufacture methamphetamine. Thus the glassware was properly seized and introduced into evidence at trial.

### 10. Hearsay Testimony.

■ The appellants allege that the trial court erred in admitting witness testimony of statements of co-conspirators because the statements were not made during the course of and in the furtherance of the conspiracy. Because we hold that the statements were by co-conspirators in the course of and in furtherance of the conspiracy we hold the appellants' argument is without merit and affirm the finding of the trial court on this issue.

"Hearsay" is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). While it is true that generally hearsay statements are inadmissible at trial, the appellants herein failed to establish in detail the context within which the testimony which appellants allege was hearsay arose, nor do the appellants analyze whether the testimony was being offered as proof of the matter asserted or simply as proof of some other fact. A review of the testimony and the complained of statements by the witnesses reveals that many of the statements were not offered as proof of the matter asserted, but rather were offered as proof that the appellants had communicated information to other members of the conspiracy.

Appellants' argument further fails in light of Federal Rule of Evidence 801(d)(2)(E), which provides that a statement is not hearsay if "the statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." From the description of the alleged hearsay statements found in the record and referred to in both the defendants' and in the government's briefs, it is evident that the majority of the alleged hearsay statements were in fact statements of co-conspirators made during the course and in the furtherance of the conspiracy. Therefore, because these were statements of co-conspirators and were not introduced to

prove the truth of the matter asserted we hold that the trial court did not err when admitting these statements into evidence and that the statements were not hearsay under 801(d)(2)(E).

### 11. Lay Witnesses.

Prior to trial, appellant Hughes' attorney sought to prohibit the testimony of non-expert witnesses as to the identity of the substances manufactured by the appellants and the motion was denied. At trial the motion was again made and denied. During trial, Debbie Feist[8] testified as to the existence of a suitcase full of methamphetamine located in appellant Hughes' automobile. An individual named Dan Faultus, who was also part of the conspiracy but who had turned state's evidence, also testified at trial that a specific substance manufactured by the appellants was PCP, and further that Faultus had delivered a quantity of methamphetamine to appellant Ellington. Faultus further testified that he had taken PCP and methamphetamine in the past and that the substances that were manufactured by the appellants and delivered to Ellington were PCP and methamphetamine because he had sampled these substances and they affected him in the same way that PCP and methamphetamine had affected him in the past. The appellants argue that it was error for the trial court to permit lay testimony identifying these substances as methamphetamine and PCP because these lay witnesses were not qualified as experts. We disagree.

 The essence of the charges against appellants herein is that they conspired to commit the illegal acts of manufacturing and distributing PCP and methamphetamine. The essence of the conspiracy charge is the agreement to commit the illegal act, *United States v. Hedman*, 630 F.2d 1184, 1192 (7th Cir. 1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981), and a charge of conspiracy is sufficient "even if it fails to allege any specific

overt act in furtherance of the conspiracy." *Bermudez*, 526 F.2d at 94. Since the agreement between the conspirators is the offense in and of itself, the individuals charged with conspiracy to manufacture illegal drugs may be convicted of the substantive offense of conspiracy whether or not the illegal drugs were ultimately manufactured. *Id.* Therefore, because it was not necessary for the government to prove that the substances were in fact illegal drugs we hold that even if the witnesses were improperly allowed to identify the substances manufactured as PCP and methamphetamine, the error is harmless.

Rule 701 of the Federal Rules of Evidence governs the use of opinion testimony by lay witnesses and reads in pertinent part:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness
> . . . .

Fed. R. Evid. 701. Generally, "[l]imitation (a) is the familiar requirement of first-hand knowledge or observation." Notes of Advisory Committee.

 Moreover, we believe, and we now hold, that, as in this case, a witness is qualified to testify as to the identity of a drug based upon his prior use and knowledge of that drug and his sampling of the substance which he identified, coupled with his statement that the drug about which he is testifying affected him in the same manner as the drug he had previously ingested. In so holding, we approve of the holding of the Eighth Circuit in *United States v. Atkins*, 473 F.2d 308 (8th Cir. 1973), where the court upheld the conviction of the defendant of aiding and abetting in the purchase of heroin on the basis that a heroin addict testified that he had worked with the defendant to purchase the heroin. The court stated that it was not implausible that a heroin addict would possess the necessary

---

**8.** Debbie Feist was defendant Sweeney's girlfriend and prior to the time that Sweeney began to manufacture, distribute and sell PCP and methamphetamine, Ms. Feist supported him and herself by engaging in prostitution.

experiential capacity to testify that the subject in question was in fact heroin. Therefore, since the government established an adequate foundation that the witnesses herein had extensive prior experience with the use and knowledge of drugs, including and not limited to methamphetamine and PCP so as to qualify them as witnesses able to identify the substances which they used, and because these witnesses testified that the drugs manufactured by the appellants affected them in the same way that PCP and methamphetamine had affected them in the past, we hold that the testimony identifying these substances as PCP and methamphetamine was admissible.

### 12. Return of Money.

During the search of appellant Hughes' residence Agent Coleman uncovered $7,000 in a locked safe. Further, the Agent seized $500 which was on appellant Hughes' person. The Agent was acting under the belief that the money seized was the fruit of the conspiracy between the parties. Hughes filed a motion *in limine* seeking to prevent the government from using the $7,500 as evidence against him. However, there was no need for the court to rule on the defendant's motion *in limine* because the government did not use the $7,500 as evidence in the conspiracy trial against defendant Hughes. The defendant sought the recovery of this money under Rule 41(e) of the Federal Rules of Criminal Procedure. The trial court granted Hughes' motion and denied the government's motion to dismiss Hughes' claim. The government's motion to dismiss was predicated upon the fact that the government had instituted forfeiture proceedings under 21 U.S.C. § 881(a)(6) and 19 U.S.C. § 1607. It is the government's position that the money represented the fruits of the alleged conspiracy between the parties and that therefore the government's confiscation of the money seized was proper under section 881(a)(6). Moreover, the government asserts that the notice of forfeiture proceedings given the defendant under 19 U.S.C. § 1607 and the regulations adopted pursuant thereto was sufficient. We fail to agree with either the position of

Hughes or the government regarding the return of the $7,500, and reverse the findings of the trial court on this issue.

Rule 41(e) of the Federal Rules of Criminal Procedure recites that "a person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property on the grounds that he is entitled to lawful possession of the property which was illegally seized." The trial court relied upon this section when ordering that the money seized be returned to Hughes, stating "the money has no further evidentiary value in this cause, and therefore pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, the court hereby adjudges and orders that the government and/or the DEA return to the defendant the $7,500." However, in light of this court's ruling that the search warrant issued to Agent Coleman was proper as being based upon a sufficient showing of probable cause, we therefore hold that Rule 41(e) does not apply, since we have found the search and seizure valid and thus not unlawful. We reverse the holding of the district court on this issue.

However, in cognizance of this court's ruling we do not at this stage of the proceedings rule that without further proceedings the Drug Enforcement Agency is entitled to retain the $7,500. Section 881(a)(6) provides:

The following shall be subject to forfeiture to the United States and no property right shall exist in them:

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that

owner to have been committed or omitted without the knowledge or consent of that owner.

Therefore, before the forfeiture proceedings established in 19 U.S.C. § 1607 become applicable it is incumbent upon the government to establish that a nexus exists between the property seized and the violation of the Controlled Substances Act. Our examination of the record and the trial court rulings leaves us unable at this time to rule on whether the government could establish to the satisfaction of a court that such a nexus exists in this case. Because we hold that the government has yet to establish that the $7,500 taken from Hughes' residence was connected to the conspiracy to distribute methamphetamine, we need not reach the issue of the sufficiency of notice given by the DEA to Hughes pursuant to 21 C.F.R. 1316.71–81 and 28 C.F.R. 9.7.

Therefore, we reverse the ruling of the lower court ordering the DEA to return the $7,500 to Hughes pursuant to Rule 41(e), and rule that should Hughes attempt to gain the return of his money, the district court must conduct further hearings to determine whether the $7,500 was furnished in exchange for controlled substances and therefore subject to the DEA forfeiture proceedings.

13. Other Issues.

The defendants herein have raised a number of other issues relating to the conduct of the prosecution at trial and the sufficiency of the evidence of their convictions. We find the appellants' arguments legally insufficient. Therefore, except as to the seizure of the $7,500 discussed above, the findings of the trial court are affirmed.