**UNITED STATES of America, Plaintiff,**

v.

**John ALLEN and Ronald Zilberbrand, Defendants.**

**No. 83 CR 764.**

United States District Court, N.D. Illinois, E.D.

May 21, 1984.

Dan K. Webb, U.S. Atty., William Coulson, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Herbert Abrams, Stephen Wade Zucker, Ltd., Skokie, Ill., Stuart V. Goldberg, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

John Allen ("Allen") and Ronald Zilberbrand ("Zilberbrand") and four other defendants [1] have been indicted in a multi-count indictment, including charges of:

1. conspiracy to distribute cocaine (Count One); and

2. possession with intent to distribute cocaine (Count Four).

Zilberbrand has also been charged with distributing cocaine (Count Three).

Shortly after Allen and Zilberbrand were arrested, law enforcement officials obtained a search warrant that authorized a search of three connecting rooms in Chicago's Blackstone Hotel. Allen and Zilberbrand have moved to quash the search warrant [2] and to suppress the evidence found in the search, asserting the government's failure to comply with Fed.R.Crim.P. ("Rule") 41(c)(2). [3]

This Court's March 15, 1984 oral ruling rejected the Allen-Zilberbrand contention the government should not be given the opportunity to reconstruct the basis of the search warrant: oral testimony given over the telephone to Magistrate Joan Lefkow. This Court's rejection was predicated on the numerous cases (including *United States v. Mendel*, 578 F.2d 668, 673–74 (7th Cir.), *cert. denied*, 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 422 (1978) in this Circuit) holding violations of Rule 41(c) should not result in exclusion of evidence unless a defendant can show:

1. the search violated the Fourth Amendment; or

---

1. One of the other defendants, Adam Mided ("Mided"), has previously filed a suppression motion. After an evidentiary hearing, this Court's March 15, 1984 memorandum opinion and order denied that motion.

2. Allen also has a pending motion to quash his arrest. His counsel is expected to advise this

Court (and government counsel, of course) in writing on or before June 1, 1984 whether Allen intends to pursue that motion in light of this opinion. Failing such advice, the motion will be considered waived.

3. See Appendix.

2. there was either prejudice to the defendant or intentional and deliberate disregard of the Rule by the government. *Accord,* such cases as *United States v. Stefanson,* 648 F.2d 1231, 1235–36 (9th Cir. 1981) (perhaps the closest case to this one on the facts); *United States v. Vasser,* 648 F.2d 507, 509–11 (9th Cir.1980), *cert. denied,* 450 U.S. 928, 101 S.Ct. 1385, 67 L.Ed.2d 360 (1981); *but cf. United States v. Hittle,* 575 F.2d 799, 801–02 (10th Cir. 1978).

Allen and Zilberbrand do not assert the officers violated the Fourth Amendment, nor is there any predicate for saying the government intentionally disregarded Rule 41(c)(2). Instead the Allen-Zilberbrand position rests on the "prejudice" alternative: Assertedly the government's failure (albeit inadvertent) to record the oral testimony impeded the ability of Allen and Zilberbrand to test whether the facts constituting probable cause were in fact communicated to Magistrate Lefkow by sworn testimony.

For the reasons set forth in this memorandum opinion and order, this Court finds and concludes:

    1. Magistrate Lefkow rightly determined probable cause existed for the issuance of the search warrant.

    2. Allen and Zilberbrand have shown no actual prejudice occasioned by the government's failure to record the oral testimony.

Accordingly the Allen-Zilberbrand motions to quash the search warrant and to suppress the seized evidence are denied.

### Facts [4]

Before the weekend of September 17–18, 1983 Sullivan had been alerted, in connection with an ongoing narcotics investigation, to the potential need for a search warrant on short notice during the course of the weekend. In turn Sullivan had apprised Magistrate Lefkow of that possibility.

Then on Sunday night September 18 Tomcik and Griffin called Sullivan and told him they did need a search warrant for some rooms at the Blackstone Hotel. Sullivan drove down to his office, met with the agents and reviewed the facts with them, taking notes as the agents talked.

It was late, and Sullivan hoped to get Magistrate Lefkow to act on the warrant application before the 10 p.m. watershed made relevant by Rules 41(c)(1) and 41(h).[5] Because of the extensive factual background that needed the Magistrate's detailed review for a probable cause determination, Sullivan decided the time needed to draft and write out an affidavit and then deliver it to Magistrate Lefkow's home for her review would certainly push matters beyond the 10 p.m. deadline. That led to Sullivan's decision to resort to the sworn-oral-testimony alternative of Rule 41(c)(2).

Accordingly, at about 9 p.m. Sullivan telephoned Magistrate Lefkow at her house and discussed the requirements for an oral affidavit. Magistrate Lefkow had neither a tape recorder nor blank search warrant forms, so she agreed to let Griffin bring those items to her house.

Once Griffin arrived at Magistrate Lefkow's house, he connected the recorder to the phone with the suction cup recording device, inserted the tape and tested the recorder to make sure it was working. It was. Griffin then called Sullivan and told him everything was ready. Sullivan then

---

**4.** This statement reflects this Court's findings of fact. They are drawn from the testimony of Assistant United States Attorney John Sullivan ("Sullivan"), DEA Task Force members Maurice Dailey ("Dailey"), Ron Tomcik ("Tomcik") and John Griffin ("Griffin"), Magistrate Lefkow and her assistant Priscilla Williams ("Williams"), together with the exhibits offered and admitted at the hearing. Where there were variations in the testimony of the witnesses, these findings reflect this Court's resolution of credibility questions.

**5.** Rule 41(c)(1) provides in part:

    The warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime.

Rule 41(h) provides in part:

    The term "daytime" is used in this rule to mean the hours from 6:00 a.m. to 10:00 p.m. according to local time.

set up a four-way phone conversation with Dailey at the Blackstone, Magistrate Lefkow at her house, and Tomcik and Sullivan at the federal building.[6] Magistrate Lefkow placed Tomcik and Dailey under oath. Sullivan then narrated the facts, periodically asking Tomcik and Dailey to confirm what he was telling Magistrate Lefkow was true. Sullivan's narration comprised all the relevant facts set forth in the complaint he prepared the next day (Ex. A to this opinion).[7] Tomcik and Dailey did verify those facts under oath.

Sullivan, Dailey and Magistrate Lefkow all testified the Magistrate asked questions about why the rooms at the Blackstone Hotel should be searched. Magistrate Lefkow remembered being told the agents believed more drugs were likely to be in the room because the first transaction had been set up on the understanding that if the buyers found the first buy was of good quality, more cocaine was available nearby and could be supplied quickly. Dailey testified, based on his substantial experience, that if the sellers were operating out of a hotel room and that was the understanding between the sellers and buyers, it was likely more drugs were in the hotel room. Magistrate Lefkow also testified the agents thought records of some sort could be found in the room.

At the end of the conversation Magistrate Lefkow (1) said she would authorize the warrant, (2) told Tomcik to sign her name to the copy of the warrant in front of him and (3) signed her copy. All the procedures already described had carried the

parties past 10 p.m. (it was then 10:28). Consequently Magistrate Lefkow authorized the search in the form required by the portion of Rule 41(c)(1) quoted in n. 5. Sullivan kept the copy of the warrant Tomcik had signed. Griffin left Magistrate Lefkow's house, leaving the tape and the other copy of the search warrant with the Magistrate. Next day Magistrate Lefkow gave the tape and search warrant to her assistant Williams, who in turn put those items under lock and key in her office, accessible only to Williams.

In late November Sullivan wanted a copy of the tape and learned a transcript still had not been made. Sullivan borrowed the tape from Williams, made copies [8] and returned the original to Williams that same day. Sullivan gave copies of the tape to the court reporter (for transcription) and to defense counsel. To everyone's consternation the original tape and all the copies were blank. No one knows why, but the consequence has been a literal noncompliance with Rule 41(c)(2)(D) and an obvious inability to determine exactly what was said during the key telephone call.

*Probable Cause*

There is no mystery as to the controlling standard for issuance of a warrant:

> As a general rule, probable cause exists when within the knowledge of the agents, certain facts and circumstances would lead a man of reasonable caution to believe that a crime is being committed or is about to be committed or that

---

6. Even though Tomcik was quite positive in stating a different recollection, under which he and Sullivan were on the same telephone serially (rather than on separate extension phones as Sullivan recalled), this Court has credited Sullivan's careful and detailed account of events. Tomcik's demeanor throughout his testimony was that of a person very positive about almost all aspects of his recollection, and there were other equally positive aspects of his testimony that posed similar questions—not as to his good faith, but as to the common phenomenon of a witness apparently testifying to how he believes things must have occurred rather than from true memory.

7. Sullivan testified (and this Court finds) the only facts he did not relate to Magistrate Lefkow were a few items at page 7 of Ex. A:

   1. As to ¶ n Sullivan gave Magistrate Lefkow an estimate, not the exact weight, of the seized cocaine.

   2. Sullivan obviously did not relate the facts stated in ¶¶ o and q and the last sentence of ¶ p.

8. For that purpose a very high-speed copier was used, so that there was no opportunity to learn the contents (if any) of the original tape in the copying process. This Court also finds the copying itself did not erase an original tape that had originally been properly recorded.

seizable property can be located at the premises in question.

*United States v. Sweeney,* 688 F.2d 1131, 1137 (7th Cir.1982); *United States v. Anton,* 633 F.2d 1252, 1254 (7th Cir.1980), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 870, 66 L.Ed.2d 808 (1981). Application of that concept to this case poses no difficulty at all.

■ Based on the information sworn to by Tomcik and Dailey during the telephone conversation, Magistrate Lefkow was apprised of enough facts and circumstances to lead to the agents' reasonable belief seizable property was located at the Blackstone Hotel rooms. Specifically Magistrate Lefkow knew about (1) the events leading up to Mided's arrest, (2) the finding of cocaine in his possession when he was arrested, (3) Mided's having been seen earlier leaving the Blackstone Hotel rooms, carrying the same distinctive plastic bag in which the cocaine was later found, (4) the sellers' original offer to sell more drugs if the first transaction went well and (5) the agents' reasonable belief more drugs were in the rooms. Surely that is enough to establish probable cause to search the hotel rooms.

### Absence of Prejudice to Allen and Zilberbrand

■ In light of the detailed evidentiary hearing and this Court's just-stated conclusion, how did the inadvertent failure to record the telephone conversation cause prejudice to Allen and Zilberbrand? *Mendel* and all the other cases cited earlier on this point speak only of a narrow kind of "prejudice"—"in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed" (*Mendel,* 578 F.2d at 673, quoting *United States v. Burke,* 517 F.2d 377, 387 (2d Cir.1975)). That is not the sense of

"prejudice" urged by Allen and Zilberbrand at all, for they surely fail that test. But even on their own terms, on an expanded concept of prejudice, they cannot succeed.

Thus this is not a case where (for example) more facts were developed after the warrant had issued and the participants later reconstructed their post-warrant knowledge as alleged pre-warrant knowledge. Even apart from this Court's findings based on the testimony, there is the compelling objective fact of the complaint prepared by Sullivan early the very next morning. None of the facts stated in the affidavit (except the precise weight of cocaine, certainly irrelevant to the probable cause question [9]) was unknown the night before. There was surely no incentive to conceal any of the known facts from Magistrate Lefkow, and this Court finds none were. Those facts were sworn to before the Magistrate. Allen and Zilberbrand are thus reduced to arguing some technical noncompliance with Rule 41(c)(2)—and this Court has also resolved that issue against them as a matter of fact and of law.

Nor is this a case where some of the key participants in issuance of the warrant were unavailable to establish the facts. All those who participated in the process were available and did testify.

For the "prejudice" test identified in the cases to have any meaning, the conclusion there was prejudice must be established by some fact other than the mere absence of the recording. Were that not so, mere noncompliance with the Rule would itself constitute "prejudice," and the entire analytical process would be circular. That is not the law.

No such "other fact" has been shown in this case.[10] Of course it would have been far better for the government to have made absolutely certain Rule 41(c)(2) had

---

**9.** All the other complaint paragraphs referred to in n. 7 simply reported on the post-search events and were also by definition irrelevant to the pre-search probable cause.

**10.** Contrary to the Allen-Zilberbrand implicit assertion, Rule 41(c)(2)(G) specifically rejects the

concept that—absent a showing of bad faith, which was not involved here—a motion to suppress may rest on the alleged unreasonableness of traveling the oral testimony route rather than using a written affidavit.

been complied with. Though the blank tape here scarcely rivals Watergate's 18½ minutes of silence, it *has* required the investment of a disproportionate amount of time and expense by both the litigants and this Court. In future the government would be well advised to take more care in using mechanical devices to avoid any possible repetition of the abortive effort that took place in this case. That however cannot change the proper result on the current motions.

### Conclusion

Allen's and Zilberbrand's motions to quash the search warrant and to suppress the seized evidence are denied.

### Appendix

### Rule 41(c)(2)

**(2) Warrant upon Oral Testimony.**

**(A) General Rule.** If the circumstances make it reasonable to dispense with a written affidavit, a Federal magistrate may issue a warrant based upon sworn oral testimony communicated by telephone or other appropriate means.

**(B) Application.** The person who is requesting the warrant shall prepare a document to be known as a duplicate original warrant and shall read such duplicate original warrant, verbatim, to the Federal magistrate. The Federal magistrate shall enter, verbatim, what is so read to such magistrate on a document to be known as the original warrant. The Federal magistrate may direct that the warrant be modified.

**(C) Issuance.** If the Federal magistrate is satisfied that the circumstances are such as to make it reasonable to dispense with a written affidavit and that grounds for the application exist or that there is probable cause to believe that they exist, the Federal magistrate shall order the issuance of a warrant by directing the person requesting the warrant to sign the Federal magistrate's name on the duplicate original warrant. The Federal magistrate shall immediately sign the original warrant and enter on the face of the original warrant the exact time when the warrant was ordered to be issued. The finding of probable cause for a warrant upon oral testimony may be based on the same kind of evidence as is sufficient for a warrant upon affidavit.

**(D) Recording and Certification of Testimony.** When a caller informs the Federal magistrate that the purpose of the call is to request a warrant, the Federal magistrate shall immediately place under oath each person whose testimony forms a basis of the application and each person applying for that warrant. If a voice recording device is available, the Federal magistrate shall record by means of such device all of the call after the caller informs the Federal magistrate that the purpose of the call is to request a warrant. Otherwise a stenographic or longhand verbatim record shall be made. If a voice recording device is used or a stenographic record made, the Federal magistrate shall have the record transcribed, shall certify the accuracy of the transcription, and shall file a copy of the original record and the transcription with the court. If a longhand verbatim record is made, the Federal magistrate shall file a signed copy with the court.

**(E) Contents.** The contents of a warrant upon oral testimony shall be the same as the contents of a warrant upon affidavit.

**(F) Additional Rule for Execution.** The person who executes the warrant shall enter the exact time of execution on the face of the duplicate original warrant.

**(G) Motion to Suppress Precluded.** Absent a finding of bad faith, evidence obtained pursuant to a warrant issued under this paragraph is not subject to a motion to suppress on the ground that the circumstances were not such as to make it reasonable to dispense with a written affidavit.

## EXHIBIT A

MAGISTRATE LEFKOW

AD 91
Rev. 11/82

### CRIMINAL COMPLAINT

# United States District Court

| | |
|---|---|
| | **DISTRICT** Northern District of Illinois |
| **UNITED STATES OF AMERICA** V. IRWIN ROSS KEIFER, RONALD ZILBERBRAND, ADAM MIDED, JOHN ALLEN, RONALD KELLEY, and HANS JORG WEHNEMANN | **DOCKET NO.** 83CR0764 |
| | **MAGISTRATE'S CASE NO.** |

Complaint for violation of Title **21**     United States Code § **846**

| NAME OF JUDGE OR MAGISTRATE | OFFICIAL TITLE | LOCATION |
|---|---|---|
| Joan Lefkow | U.S. Magistrate | 219 S. Dearborn Chicago, IL 60604 |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (If known) |
|---|---|---|
| Sept. 6 to Sept. 18, 1983 | Chicago and elsewhere | |

**COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:**     The six defendants

did conspire, combine, confederate and agree together to commit offenses against the United States, to wit, to knowingly and intentionally distribute and possess with the intent to distribute cocaine, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

**BASIS OF COMPLAINANTS CHARGE AGAINST THE ACCUSED:**

SEE ATTACHED AFFIDAVIT

**MATERIAL WITNESSES IN RELATION TO THIS CHARGE:**

| | |
|---|---|
| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | **SIGNATURE OF COMPLAINANT (official title)** |
| | **OFFICIAL TITLE**   JACK GRIFFIN Task Force Agent Drug Enforcement Administration |
| Sworn to before me and subscribed in my presence; | |

| SIGNATURE OF MAGISTRATE(1) | DATE 19 SEP 1983 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

STATE OF ILLINOIS )
) SS
COUNTY OF COOK )
JACK GRIFFIN, being duly sworn on oath states:

1 Affiant has been informed of all of the following by DEA Special Agent Ronald Tomcik.

a. Prior to September 6, 1983, DEA Special Agent Ronald Tomcik and Minnesota State Police Agent Paul Stevens, work-

ing undercover, had arranged to meet Irwin Ross Keifer in Chicago for purposes of purchasing cocaine through Keifer.

b. At approximately 6:45 p.m. on September 6, 1983, Agents Tomcik and Stevens were in Chicago and placed a telephone call to Keifer. The agents told Keifer that they had arrived in Chicago and were in Room 2134 at the Hyatt Hotel near O'Hare Airport. Keifer said he had to make one stop but he would be right there.

c. At approximately 8:10 p.m., Keifer arrived at Room 2134 of the Hyatt and met with Agents Tomcik and Stevens. Keifer gave the agents a small sample of cocaine. The agents gave Keifer $9,600 in United States currency. Keifer left the keys to his automobile with the agents. Keifer said he had to go to a hotel and meet the guy. At approximately 9:50 p.m., Keifer left Room 2134 and the Hyatt.

d. DEA Task Force Agents conducting surveillance of the Hyatt saw Keifer exit the Hyatt and hail and enter a cab. These agents followed Keifer in the cab to the Marriott Hotel near O'Hare. There the agents saw Keifer enter the hotel and walk into the Firehouse Tavern. Keifer went into this bar and met with a white male individual. After a few minutes, Keifer and this male exited the bar and walked to and entered a 1973 Mercedes Benz 450 SL, bearing Illinois license plates numbered YLY 57, which was sitting in the Marriott parking lot. Keifer and this male sat in the car in the lot for several minutes. At 10:20 p.m. surveillance agents saw Keifer exit the vehicle alone, carrying a brown manila envelope, approximately 5″ × 8″ in size. Keifer put the envelope in his front coat pocket. He then waited in front of the Marriott for a cab.

e. The records of the Illinois Secretary of State's Office indicates that Illinois license plates bearing number YLY 57 is registered to Bonnie S. Zilberbrand, 424 West Melrose, Chicago, Illinois 60657 for a 1973 Mercedes Benz 450 SL.

f. At 10:25 p.m., surveillance agents saw Keifer enter a cab and the agents followed the cab to the Hyatt Hotel near O'Hare. Keifer exited the cab and entered the hotel.

g. Shortly after 10:25 p.m., Keifer again met with Agents Tomcik and Stevens in Room 2134 of the Hyatt. There, Keifer took out a brown manila envelope from which he removed four clear plastic ziplock bags, each of which contained another ziplock bag containing a white powdery substance.

h. Thereafter, outside the presence of Keifer, the agents performed a field test on the white powdery substance and got a positive reaction for cocaine.

i. On September 8, 1983, Agent Tomcik had telephone conversations with Keifer. Keifer said his people were willing to mail three airline tickets to Agent Tomcik so Agents Tomcik and Stevens and their chemist could fly to Chicago. Keifer said when they all got to Chicago, they and their chemist could come in, they would be shown and could test seven kilos of cocaine and if they liked it, could take it with them for $65,000 per kilo.

j. On September 15, 1983, Agents Tomcik and Stevens had a telephone conversation with Keifer. Keifer said that his people would only do one and one-half kilos at a time, that is that one and one-half kilos would be delivered to the agents in Chicago; the agents would then pay for the kilo and a half; the money would then be taken to Keifer's people and, thereafter, Keifer's people would decide whether to sell another kilo and one-half.

k. On September 16, 1983, Special Agent Ronald Tomcik had a telephone conversation with Irwin Ross Keifer. Special Agent Tomcik advised Keifer, in part, that Special Agent Tomcik would not travel to Chicago, Illinois for less than two kilograms of cocaine. Keifer told Special Agent Tomcik that Keifer was fairly certain that Keifer would be able to furnish Special Agent Tomcik with two kilograms of cocaine.

l. On September 17, 1983, Special Agent Tomcik telephoned Kiefer from the Hyatt Regency O'Hare, Chicago, Illinois during

the evening hours. Special Agent Tomcik stated that Special Agents Stevens and Tomcik would arrive in Chicago, Illinois on September 18, 1983, during the early afternoon. Kiefer stated that Kiefer would have two kilograms of cocaine available, and that Special Agent Tomcik should anticipate Kiefer being at home at about 4:00 p.m.

m. On September 18, 1983, at about 4:00 p.m., Special Agent Tomcik telephoned Kiefer from the Hyatt Regency, O'Hare, Chicago, Illinois. Special Agent Tomcik advised Kiefer that Special Agents Stevens and Tomcik were in Room number 803 at the Hyatt Regency O'Hare, Chicago, Illinois. Kiefer stated that Kiefer would leave Kiefer's location in about fifteen minutes and proceed to Special Agent Tomcik's location.

n. On September 18, 1983, at about 5:00 p.m., Kiefer met with Special Agents Stevens and Tomcik in room number 803 at the Hyatt Regency O'Hare, Chicago, Illinois. Kiefer, in part, stated that Kiefer could obtain one kilogram of cocaine which would cost $70,000.00. Kiefer stated that the cocaine was being furnished by two individuals: one person is Ronnie who owns parking lots; and, one person who is in the produce business. Kiefer related that these two individuals supplied Special Agents Stevens and Tomcik with the one-quarter pound of cocaine on September 6, 1983.

o. Kiefer stated that after one kilogram of cocaine was purchased, another kilogram of cocaine could probably be purchased the same day, and possibly more.

p. Kiefer stated that later in the coming week, Special Agents Stevens and Tomcik could purchase as much weight as desired, in multiple kilogram quantities. Kiefer related that Kiefer would have to telephone Kiefer's man and that the cocaine transaction would probably not take place at the Hyatt Regency.

q. Kiefer later left room number 803 having stated that Kiefer had to telephone Kiefer's associate.

Upon Kiefer's return to room number 803, Kiefer stated that Kiefer's associate was waiting on a phone call as to where the cocaine transaction would take place and that Kiefer's associate would be phoning Kiefer in room 803.

2. Affiant was informed of the following by DEA Task Force and Special Agents:

a. At about 6:10 p.m. Adam Mided and Ronald Zilberbrand got into a brown jeep, Illinois plate number ACTER at 424 Melrose, Chicago, Illinois and went to 1400 N. Lakeshore Drive, Chicago, Illinois, entering the premises at about 6:25 p.m.

b. At about 6:30 p.m., Special Agent Stevens answered the phone in room 803 at the Hyatt Regency O'Hare, Chicago, Illinois. The individual calling asked for Ross Kiefer. After the conversation between Kiefer and the individual calling, Kiefer stated that Special Agents Tomcik and Bridges would have to go with Kiefer to the Drake Hotel, Chicago, Illinois and meet Kiefer's associate Ronnie.

c. At about 6:40 p.m. on September 18, 1983, Kiefer, accompanied by Special Agents Tomcik and Bridges, left the Hyatt Regency O'Hare via taxi, arriving at the Drake Hotel at about 7:10 p.m.

d. At about 6:35 p.m. on September 18, 1983, Mided and Zilberbrand entered the aforementioned jeep and drove to 636 S. Michigan, Chicago, Illinois which is the Blackstone Hotel, both entering the hotel at about 6:50 p.m., observed by Task Force Special Agent Dailey, and entering room 604.

e. At about 7:00 p.m., Task Force Special Agent Dailey observed Mided and Zilberbrand exit either room 605 or 606. Zilberbrand was carrying a dark blue plastic bag with handles. The dark blue bag had writing thereon. Mided and Zilberbrand exited the Blackstone Hotel, entering the aforementioned jeep, and Mided being the driver and Zilberbrand the passenger.

f. Task Force Special Agent Dailey a short time later observed three individuals, later identified as Hans Jorg Wehnemann, Ronald L. Kelley, and John C. Allen exit

the Blackstone Hotel. Allen went to a liquor store, while Wehnemann and Kelley went to a restaurant. Shortly, all three individuals returned to the Blackstone Hotel.

g. At about 7:15 p.m. on September 18, 1983 surveillance observed Zilberbrand exit the aforementioned jeep after arriving at Oak and Michigan Streets and Zilberbrand then met with Special Agents Bridges and Tomcik and Irwin Ross Kiefer.

h. Task Force Special Agent Evans observed Mided proceed from Oak and Michigan Streets to the S.W. corner of Shiller Street and Lakeshore Drive where Mided parked the jeep. Mided exited the jeep carrying the aforementioned described dark blue bag and entered the front entrance to 1400 Lakeshore Drive as observed by Task Force Special Agent Evans, at about 7:20 p.m.

i. At about 7:20 p.m. Special Agents Bridges and Tomcik, with Zilberbrand and Kiefer, walked to 1400 Lakeshore Drive from the Drake Hotel, arriving at about 7:30 p.m.

j. Zilberbrand told Special Agents Bridges and Tomcik that all parties were proceeding to 1400 Lakeshore Drive and would be going to an associate's office at that location. Zilberbrand stated that one kilogram of cocaine was in the office with Zilberbrand's associate and the price was $70,000.00.

k. At about 7:30 p.m. Zilberbrand and Kiefer were stopped by Task Force Special Agents Gallagher and other Task Force Special Agents inside the main lobby at 1400 Lakeshore Drive, Chicago, Illinois.

l. Task Force Special Agents J. Griffin and T. Bridges, Special Agents J. Gallagher and Tomcik observed Adam Mided exit room 15–G at 1400 Lakeshore Drive and walk in the hallway toward the elevators.

m. When Mided observed the Task Force Special Agents in the hallway, and the Task Force Special Agents stating the name "Adam," Mided was observed by all present Task Force Special Agents to drop the aforementioned described dark blue bag and a pair of trousers to the floor.

Task Force Special Agent J. Griffin then immediately retrieved those items.

n. On September 18, 1983, Task Force Agent Griffin retrieved the dark blue bag. The contents of the dark blue bag were two silver taped bags containing a powdery substance. The contents were field tested by Task Force Agent Bridges and was positive for cocaine. The gross weight was 1302.4 grams.

o. On September 18, 1983, Kiefer, Zilberbrand, and Mided were transported to the Chicago, Illinois Drug Enforcement Administration Task Force Office subsequent to arrest.

p. At 8:00 p.m. on September 18, 1983, Task Force Special Agent Dailey, and other Task Force Special Agents secured rooms 604, 605 and 606 at the Blackstone Hotel, Chicago, Illinois. Inside the suite of rooms the agents found defendants John Allen, Ronald Kelley and Hans Jorg Wehnemann.

q. At about 10:28 p.m. on September 18, 1983, United States Magistrate Joan Lefkow authorized a telephonic search warrant for the above referenced rooms at the Blackstone Hotel.

JACK GRIFFIN, Task Force Agent