UNITED STATES of America, ex rel.
LOVINGER, Plaintiff,

v.

CIRCUIT COURT FOR the 19TH JUDI-
CIAL CIRCUIT, LAKE COUNTY,
ILLINOIS, Defendant.

No. 85 C 10169.

United States District Court,
N.D. Illinois, E.D.

Feb. 2, 1987.

Mary Robinson, Robinson & Skelnik, Elgin, Ill., Robert P. Will, Jr., Will & Briscoe, Waukegan, Ill., for plaintiff.

Mark Rotert, Asst. Atty. Gen., for defendant.

## ORDER

NORGLE, District Judge.

This matter is before the Court for ruling on Respondent, Illinois Circuit Court for the 19th Judicial Circuit, Lake County, Illinois', objections to Magistrate Bucklo's Report and Recommendation. Pursuant to 28 U.S.C. § 636(b)(1)(A), (B), the Court referred the Petition for Writ of Habeas Corpus to the Executive Committee for assignment to a magistrate for ruling in 60 days. The Executive Committee gave its consent and this case was assigned to Magistrate Bucklo on June 17, 1986.

On December 17, 1986 Magistrate Bucklo filed her Report and Recommendation. The report recommended this Court grant the Petition for Writ of Habeas Corpus. On January 5, 1987 Respondent filed objections to Magistrate Bucklo's Report and Recommendation.

The record shows *inter alia* that after several days of difficult trial Judge Hoogasian sua sponte declared a mistrial. He said: "I'm not going to have any case with a tint of error, and we are starting to have a lot of error creep into this record." Following that statement, he heard no further evidence or argument, took a recess, returned, and sua sponte declared a mistrial, the basis for which he stated in the record.

It is a rare case indeed in which a trial judge in a bench trial cannot control by proper use of his discretion the attorneys and the witnesses who appear before the court. The record here does not show any intentional, contumacious or substantial misconduct on the part of the attorneys or the witnesses. The slow pace of the trial and its many problems would challenge the best of judges, but none of whom would be without sufficient authority, including the imposition of sanctions if called for, to see to it that the trial moved fairly and expeditiously to a just conclusion. The problems here perceived by the trial judge could have been corrected short of aborting the trial sua sponte. For fleeting moments during the course of protracted trials, a jurist may ruefully wish for the opportunity to start anew. Such is not the law nor ought it be. Even the pursuit of the elusive and unattainable perfect trial is not enough. This trial should have been decided on its merits.

In its Objection to the Report and Recommendation of the Magistrate, Respondent asks, alternatively, for "an evidentiary hearing wherein the Petitioner's deliberate by-pass may be litigated." This court finds that a hearing on issues raised by the Respondent and characterized as procedural defaults, strategic by-pass of the right to proceed, calculated decision to acquiesce, deliberate by-pass, and inexcusable neglect is neither required nor appropriate in light of the clear record in this matter.

Petitioner complied with all state procedural requirements in asserting his double jeopardy claim in the state court. The Magistrate discussed fully the issue of whether Petitioner had consented to the mistrial declared by the state trial judge as a question of federal constitutional law. *United States ex rel Clauser v. McCevers,* 731 F.2d 423 (7th Cir.1984). Further, this court finds the requirements set forth in *Wainright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), that Petitioner show cause and prejudice before a federal court can adjudicate his claim of a constitutional deprivation on the merits, have been satisfied in this case.

After a *de novo* review, the Court finds Magistrate Bucklo's Report and Recommendation is supported by the record and the cited authorities. Accordingly, the Court adopts and incorporates Magistrate Bucklo's Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) as Appendix A of this Order and orders as follows:

The Petition of Jeffrey Lovinger for Writ of Habeas Corpus is granted.

IT IS SO ORDERED.

APPENDIX A

REPORT AND RECOMMENDATION

December 17, 1986

ELAINE E. BUCKLO, United States Magistrate.

 Jeffrey Lovinger ("Lovinger") was tried in a bench trial before the circuit court for the Nineteenth Judicial Circuit, Lake County, Illinois, on three counts of delivery of cocaine and cannabis. That trial ended in a mistrial. When the case was set for retrial, Lovinger moved to dismiss on double jeopardy grounds.[1] The court denied his motion and Lovinger appealed. The Appellate Court affirmed the denial of the motion, *People v. Lovinger*, 130 Ill. App.3d 105, 85 Ill.Dec. 381, 473 N.E.2d 980 (2nd Dist.1985), and the Illinois Supreme Court and United States Supreme Court denied certiorari, —— U.S. ——, 106 S.Ct. 248, 88 L.Ed.2d 256. Having exhausted his state court remedies, Lovinger petitioned the federal district court for a writ of habeas corpus. For the reasons stated below, Lovinger's petition should be granted.

Lovinger was arrested on October 16, 1979 after he allegedly sold substances purported to be cocaine and cannabis to an undercover police agent. A bench trial before Judge Hoogasian began on November 3, 1982.

The State's first witness was Paula Lemke, a police officer. She testified that on October 15, 1979 she purchased from Lovinger a quantity of a white powder which he represented to be cocaine (People's Exhibit No. 1), R–14–20, and that on October 16, 1979, she purchased from Lovinger three packages of a white powder (People's Exhibit No. 2) and one package of a green leafy substance (People's Exhibit No. 3) which he represented to be cocaine and cannabis, respectively. R–31–46.

During cross-examination Lemke testified that Lovinger's expert had been given a sample from only one of the three bags in People's Exhibit No. 2. Judge Hoogasian expressed concern that the State had not complied with his discovery order that Lovinger's expert be permitted to test all three packages in People's Exhibit No. 2, and continued the trial until this order was complied with. R–60–4.

When the trial resumed, Lemke testified on cross-examination that on October 5, 1979, she and another person purchased a quantity of a powder purported to be cocaine from Jeffrey Lovinger (Defendant's Exhibit No. 1, Exhibit No. 4), R–74–82, and that she bought a further quantity of a powder purported to be cocaine from Lovinger on October 10, 1979. (Defendant's Exhibit No. 2, Exhibit No. 5), R–86–9.

David Stroz, an analyst at the Northern Illinois Police Crime Laboratory, testified that he received People's Exhibit No. 1 on October 19, 1979 from police officer Tom Hutchings and People's Exhibits Nos. 2 and 3 on October 17, 1979. He received People's Exhibit No. 2 from police officer Michael Bowden. R–239–41, 250–2, 277–8. He tested the exhibits on October 19 and found that all the white powders contained cocaine and that the green leafy substance contained cannabis. R–249, 260, 281–2. He removed People's Exhibits Nos. 4 and 5 from the evidence locker on October 22, 1979, tested them, and determined that they contained cocaine. R–286, 290, 293–300.

The State's next witness was police officer Thomas Hutchings. He testified that at all relevant times he was an evidence officer for the Waukegan Police Department. He testified that he first saw People's Exhibit No. 1 on October 16, 1979, when he received it from Officer Michael Bowden, and that it remained in a locked evidence room until October 19, 1979 when he delivered it to Stroz at the Northern Illinois Police Crime Lab. R–402–4. It

---

1. The fact that Lovinger was tried in a bench trial, rather than a jury trial, does not affect his rights under the double jeopardy clause. *United States v. Jenkins*, 420 U.S. 358, 365, 95 S.Ct. 1006, 1011, 43 L.Ed.2d 250 (1975) (overruled on other grounds, *United States v. Scott*, 437 U.S. 82, 87, 98 S.Ct. 2187, 2191, 57 L.Ed.2d 65 (1978); *Gwinn v. Deane*, 613 F.2d 1, 2 n. 3 (1st Cir. 1980)).

was returned on October 26, 1979, R–405. He testified that he next came into contact with it on November 18, 1982 when it was requested by the prosecutor. R–406–7. He later testified that Officer Lemke removed the entire exhibit on September 8, 1982 and returned it the same day, and that she took a sample from the exhibit on September 14, 1982. R–410–413. The exhibit remained in his custody and control between then and November 18, 1982. R–418.

Hutchings testified that he first came into contact with People's Exhibit No. 2 on October 26, 1979, and that the exhibit remained in the evidence room until September 8, 1982. R–426–8. On that date it was turned over to Officer Lemke, who returned it the same day. R–428–32. Officer Lemke took a sample from the exhibit on September 14, 1982. R–433. Hutchings testified that the exhibit remained in the evidence room until November 4, 1982, when it was turned over to Walter Williams for outside examination. R–438. Hutchings testified that he next saw Exhibit No. 2 on November 9, 1982 when Williams returned it. Hutchings testified that on November 4, he gave Williams four exhibits, including Exhibits Nos. 1 and 2, all of which were returned on November 9. R–441.

The prosecutor then attempted to elicit testimony resolving the inconsistency between this testimony and Hutchings earlier testimony that he had not come into contact with Exhibit 1 between September 14, 1982 and November 18, 1982. R–442–6. The judge stated that the prosecutor was developing two chains of evidence and impeaching his own witness. R–448–9. The judge then granted a recess so that the prosecutor could "get [his] act together."

After the recess, defense counsel stated that Lovinger's sister had told him that the prosecutor and Hutchings had been discussing the case and examining and exchanging papers for about 10 minutes. He stated that he felt any remaining testimony of Hutchings would be tainted and that Hutchings would be testifying not to his own recollections but rather according to the directions of the prosecutor. R–451–3.

The prosecutor stated that he had told Hutchings he could not discuss the case with him, that he had then asked for, received, and looked at Hutchings' records, and that he asked Hutchings to review his records and testify from memory. R–453.

The judge stated that the prosecutor had acted improperly, but that no fatal error had occurred, and that if the defense counsel's statement had been a motion for a mistrial, it would be denied. He ordered that there be no further conversations between the prosecutor and Hutchings. R–456. The defense counsel then moved that Hutchings' testimony be stricken in its entirety, that he be precluded from testifying further, and that a mistrial be declared. R–456–7. Judge Hoogasion denied these motions. *Id.*

Hutchings then testified that he turned over Exhibits Nos. 1 and 2 to the prosecutor on November 3, 1982, and received them back from Walter Williams on November 9, 1982. R–461–5. Later, however, on cross-examination, he testified that he could not remember when he turned over Exhibits 1, 2, and 3 to the prosecutor. R–578. He then testified, after refreshing his recollection, that he had turned over Exhibit Nos. 1 and 2 to the prosecutor on November 18, and that they were returned by the prosecutor on November 19. R–465–6, 467–8.

Hutchings testified that he first came into contact with People's Exhibit No. 3 on October 26, 1979, that he received it from Muriel Samuels and that upon receiving it he placed it in the evidence room. R–475–7. On September 14, 1982, Lemke took a sample from the exhibit in Hutchings presence and resealed it. R–478. The exhibit thereafter remained in the evidence room until he turned it over to the prosecutor on November 3, 1982. R–480. Initially, Hutchings could not recall when he received the exhibit back from the prosecutor; R–480–481; after a short recess Hutchings' recollection was restored and he testified that the prosecutor returned it

 to him on November 4, 1982. R–482. He turned the exhibit over to the prosecutor again on November 18, 1982, and received it back the following day. R–482.

The court then recessed until 9:30 the following Monday, after having instructed Hutchings

not to discuss this matter, this case, nor your testimony, nor the evidence with any lawyers, witnesses, strangers, police officers or any individual because you are under oath and because we don't want any mistrial to occur.

R–486.

When court resumed, Hutchings testified that he received People's Exhibit No. 4 on October 5, 1979, that he delivered it to Richard Haviland, an employee of the crime lab, on October 12, 1979, that he received it back on October 26, 1979, and that it remained in storage until November 3, 1982 when it was given to the prosecutor. R–495–8. He stated, however, that he could not recall when he received it back. Upon further questioning, he stated that he had no records indicating that it had been given to the prosecutor on November 3, and that his first written record showed that he gave the exhibit to Walter Williams, an employee of the States Attorney's Office, on November 4, 1982. R–498–501. The following colloquy occurred:

Q. Did you give it to me on November 3, 1982?

A. With the records I have in front of me, I would have to say no.

R–501.

Judge Hoogasian observed

The record speaks for itself ... This record has got evidence going out and never returning. This record has got the evidence, the same evidence going out twice, never returning the first time. There is confusion.

R–502.

On cross-examination, Hutchings testified concerning the layout and procedures for receiving and storing evidence. When the evidence room was closed, officers bringing in evidence would put it in one of a battery of lockers outside the booking room. Each locker had two keys; one was in Hutchings' office, and the second was in the locker. After depositing evidence, the officer would remove the key and deposit it in a special locker. Each morning Hutchings would open that locker, collect the keys, open the lockers and remove the evidence to the evidence room. R–538–41.

During cross-examination, Hutchings testified that a log book was kept which included the date of each time evidence was delivered to or removed from the evidence room. R–538. The defense counsel requested that he be permitted to examine the log book. The prosecutor objected that the request was untimely. He admitted that the log book had not been tendered on discovery, since "it is not a statement of any witness in the case." The judge nevertheless granted a half hour recess for the prosecutor and defense counsel to examine the log book. Counsel were instructed not to question the witness. R–550.

On further cross-examination, Hutchings testified that an entry in the log books in his handwriting indicated that People's Exhibit No. 2 was accepted in the evidence room on October 17, 1979, but that this was an error; the exhibit had been confiscated on that date, but was received in the evidence room on October 26, 1979. R–563–7.

The next witness was Michael Bowden, a police officer. He testified that he conducted surveillance of the October 15, 1979 and the October 16, 1979 transactions. R–598–601, 605–9. Bowden brought People's Exhibit No. 1 back to the police station at about 3:00 on October 15, put it in an evidence locker, kept the key, opened the locker on the morning of October 16, removed the exhibit, and gave it to Hutchings, the evidence officer. R–603–5. He received People's Exhibits Nos. 2 and 3 on October 16, placed them in an evidence locker, retained the key, opened the locker the following morning, took the exhibits to the Northern Illinois Crime Laboratory, and gave them to David Stroz. R–613–4.

Bowden also testified that he had received People's Exhibit No. 4 on October 5,

1979, that he put it in an evidence locker, retained the key, opened the locker the following Monday, October 8, 1979, removed the exhibit and gave it to Hutchings. R–615–6. He received People's Exhibit No. 5 on October 10, 1979, placed it in an evidence locker, retained the key, removed the exhibit the following day and gave it to Hutchings. R–618–9. The prosecutor then asked when Bowden turned over Exhibit No. 5 to Hutchings; Bowden stated that he believed it was the following day, but that he would have to check his reports or the crime lab sheet to be certain. The prosecutor sought to refresh Bowden's recollection and defense counsel objected. Judge Hoogasian then continued the case until that afternoon, and said "You don't talk with them. They don't talk with you about this case." R–619–20.

When proceedings resumed, defense counsel stated that "Once again I am informed that [the prosecutor] has been talking to a witness," Officer Bowden. R–622. The prosecutor stated that he asked Bowden for police reports from October 5 and 10, 1979. R–622, 628. Bowden stated that the prosecutor had not talked with him, but that he had told the prosecutor "that I wasn't pleased with the fact that I was getting my butt chewed out." R–623. Lovinger testified that he heard the prosecutor ask Bowden about police reports for October 5 and 10 and that Bowden said he was not sure he wrote any and did not have them with him, and that a little later he heard the prosecutor and Bowden talking about the key to the evidence locker. R–626–7. Judge Hoogasian asked the prosecutor for the reports, and stated "I'm not going to have any case with any tint of error, and we are starting to have a lot of error creep into this record." R–629. A short recess was then taken.

When proceedings resumed, Judge Hoogasian made the following statement:

> Is everybody in court? Let the record show that the Defendant is present in open court and in his own proper person, with Robert P. Will, his attorney. That the People are represented by Steven McCullom.
>
> Gentlemen, at this time I want to put something on the record. I have not been satisfied with the way this case has been presented. First, I call to the attention of everybody in this courtroom that because of the laxity of the prior State's Attorney and his administration, there was nothing done to resolve this cause of action before a jury or bench trial because of the fact that this matter had occurred in 1979.
>
> Secondly, I am concerned about the lack of discovery afforded the defense, pursuant to court order of Judge Doran, and even of this court.
>
> Third, there was failure to fully comply with the orders of the Court during trial regarding discovery. For example, I point out to my order of September 7th and the fact that a witness in this cause did remove portions from Group Exhibit No. 2, for identification, when I had ordered all of the exhibits to be taken to the defense chemist for purpose of analysis, pursuant to the order of discovery.
>
> Fourth, I am very much concerned about what occurred early this afternoon in this courtroom. And this can be classified as either direct or indirect contempt, and I'm not going into that phase of it. Because of the talking about a pending matter with a witness who says he did not talk with the Assistant State's Attorney, and the Assistant State's Attorney saying to me that he did not talk with the witness, except for request by Bob Will, representing the Defendant and then you changing your conversation after Lovinger under oath indicated certain things. And then you said something else contrary, and it's all on the record.
>
> At this point, in the trial, it is questionable, and I doubt whether discovery has been completed by the state to the defense.
>
> And further it has been disclosed by the witness on the stand, when he said, "I told him I was not pleased with the fact I was getting my butt chewed out, but that was it."

I, as the Court, am wholly unaware of any—I'm sorry. I am only aware of a reprimand by anyone except my admonition to the witness, to the defense and to the Assistant State's Attorney, not to discuss this case with anyone. And prior to I continuing this matter this morning, I said, "I am going to continue this case to 1:30. You don't talk with them; they don't talk with you about this case. Again I'm going to advise, let's get everything in order."

I feel error has crept into this trial and it can only be resolved by me declaring a mistrial, which I so order, and I recuse myself from this case, and I order you to appoint another judge. Call the Clerk. And the only other judge that will not take this is Strouse, because he had recused himself before. And after it is assigned to another judge, I instruct you to go to the other judge and let him set it for trial. Bond is continued.

R–630–2. As Judge Hoogasian finished the statement, he left the courtroom. R–644.

### I.

██ Lovinger argues that retrial is barred by the double jeopardy clause of the fifth amendment, made applicable to the states by the fourteenth amendment. *Benton v. Maryland*, 395 U.S. 784, 787, 89 S.Ct. 2056, 2058, 23 L.Ed.2d 707 (1969). The double jeopardy clause protects a criminal defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). Society, however, has an interest in trying a defendant in a fair trial ending in a just judgment. *Id.* These interests must be balanced. Thus, when a defendant's conviction is reversed on grounds other than insufficient evidence, the double jeopardy clause does not bar retrial. *United States v. Scott*, 437 U.S. 82, 90–1, 98 S.Ct. 2187, 2193, 57 L.Ed.2d 65 (1978). Similarly, the double jeopardy clause does not always bar retrial after a mistrial.

### II. *Consent*

██ When a defendant consents to a mistrial, retrial is barred only if the conduct of the State giving rise to the mistrial was intended to provoke a mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 679, 102 S.Ct. 2083, 2091, 72 L.Ed.2d 416 (1982). The State argues that Lovinger consented to the mistrial in the present case. A defendant must "affirmative[ly] consent" to the mistrial. *United States ex rel. Clauser v. McCevers*, 731 F.2d 423, 426 (7th Cir.1984). Even where the defendant does not expressly request or consent to the mistrial, however, consent may sometimes be inferred. In determining whether there was consent, the court must look at all relevant circumstances. Thus, in *United States v. Goldstein*, 479 F.2d 1061 (2nd Cir.) *cert. denied*, 414 U.S. 873, 94 S.Ct. 151, 38 L.Ed.2d 113 (1973), the defendants were tried for tax law violations. The trial judge declared a mistrial. The State sought to retry the defendants, but the trial court dismissed on double jeopardy grounds. *Id.* at 1062–4. On appeal, the court noted that the defendants had moved for and been denied a mistrial on grounds of jury deadlock two hours before the court declared a mistrial on the same grounds, that their position had not changed substantially in the interim, that they had done nothing during that period to indicate that they no longer sought a mistrial, and that they had an opportunity to object to the declaration of a mistrial but did not.[2] The court concluded that under the totality of the circumstances the defendants had consented to the mistrial. *Id.* at 1067–8.

██ In the present case, these factors weigh against finding consent. Lovinger's motion for a mistrial occurred after he

---

**2.** The Third Circuit has held that failure to object to a declaration of a mistrial waives challenges to the mistrial; in effect, consent is presumed. *United States v. Phillips*, 431 F.2d 949, 950–1 (3rd Cir.1970). The Seventh Circuit has implicitly rejected this view. *See Clauser, supra*, 731 F.2d at 426. The Second Circuit considers failure to object as one factor among others probative of consent. *Goldstein, supra*, 479 F.2d at 1067 n. 11.

brought to the court's attention a conversation between the prosecutor and Officer Hutchings. Initially, he did not make any motions. The judge stated that the conversation was improper but harmless, and that if Lovinger was moving for a mistrial, the motion was denied. Only then did Lovinger move for that Hutching's testimony be stricken, that he be prohibited from testifying further, and for a mistrial. The judge denied all motions. R–451–7. Lovinger's motion for a mistrial was perfunctory, and he knew when he made it that it would be denied.

Moreover, Lovinger sought the mistrial on grounds different from those for which Judge Hoogasian declared the mistrial. Lovinger sought a mistrial because of an improper conversation between the prosecutor and Officer Hutchings. Judge Hoogasian declared the mistrial because of undue delay in bringing the case to trial, the prosecution's failure to grant full discovery and obey court discovery orders, and the prosecutor's improper conversation with Officer Bowden. Judge Hoogasian made no reference to the prosecutor's earlier conversation with Hutchings. Admittedly, the impropriety involved in both conversations was similar; but the mistrial was declared because of a different conversation from the one for which Lovinger sought a mistrial.

Lovinger did not withdraw his motion for mistrial or otherwise expressly indicate he no longer thought mistrial was necessary. *Cf. United States v. Kwang Fu Peng,* 766 F.2d 82, 85 (2nd Cir.1985); *United States v. Mastrangelo,* 662 F.2d 946, 950 (2nd Cir. 1981) *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982); *United States v. Evers,* 569 F.2d 876, 878 (5th Cir.1978) (express withdrawals of motions for mistrial). However, his position did change between the time at which he moved for mistrial and the time at which a mistrial was declared. At the time of Lovinger's motion, Officer Hutchings was testifying concerning the chain of custody. At that point, he had testified both that People's Exhibit No. 1 had not left his custody between September 14, 1982 and November

18, 1982, R–418–9, and that he had turned over People's Exhibit Nos. 1 and 2 to Walter Williams on November 4, 1982, who returned the exhibits on November 9, 1982. R–440–1. The conversation which led to Lovinger's motion for mistrial was apparently intended to help resolve this discrepancy. When he resumed the stand, Hutchings offered a third version, that he had turned over Exhibits 1 and 2 to the prosecutor on November 3, 1982 and that Walter Williams had returned them on November 9, 1982. R–461–5. His testimony regarding the chain of custody of Exhibit No. 4 was confused and contradictory, R–498–50, and his testimony concerning the procedures for storing evidence when the evidence officer was gone, R–538–41, was inconsistent with Officer Bowden's testimony of how he had stored evidence in such cases. R–603–5, 613–4. The inconsistencies and confusion in Hutchings' testimony were not corrected by the conversation, but continued; Lovinger's need for a mistrial because of the conversation was correspondingly reduced.

The mistrial was precipitated when Lovinger brought to the court's attention a conversation between the prosecutor and Officer Bowden. His actions were similar to those he took in response to the earlier conversation. Given the similarity in the objectionable conduct (conversations between the prosecutor and witnesses possibly concerning contradictions in their testimony), it might be argued that by bringing the second conversation to the court's attention, Lovinger was also implicitly renewing the motion for a mistrial which he had made after the earlier conversation.

When he brought the first conversation to the court's attention, however, Lovinger did not initially make any motions. Although he stated that Hutchings' testimony would be tainted by the conversation, he would not necessarily have wanted a mistrial. By bringing the matter to the court's attention and putting it on the record, he might discredit Hutchings' subsequent testimony. It was only after Judge Hoogasian ruled that the conversation was harm-

less and if Lovinger was moving for a mistrial, the motion was denied, that Lovinger moved for a mistrial. Before he did so, however, he moved that Hutchings' testimony be stricken in its entirety, and that he be precluded from testifying further; only after these motions were denied did Lovinger seek a mistrial. R–451–6. In light of this rather ambiguous sequence of events, it is difficult to conclude that in bringing the second conversation to the court's attention Lovinger was renewing his earlier motion for a mistrial.

The mistrial was declared in an abrupt manner. The judge recited problems with the trial, then declared a mistrial; he left the courtroom as he was declaring the mistrial. R–644. Lovinger thus had little opportunity to object to the mistrial, and his failure to do so should not weigh heavily in favor of finding consent. *See Gori v. United States*, 367 U.S. 364, 365 n. 6, 81 S.Ct. 1523, 1524 n. 6, 6 L.Ed.2d 901 (1961) ("In light of our disposition, we need not reach the Government's suggestion that petitioner's failure to object to the mistrial adversely affects his claim. We note petitioner's argument that, because of the precipitous course of events, there was no opportunity for such objection."); *United States v. Jorn*, 400 U.S. 470, 487, 91 S.Ct. 547, 558, 27 L.Ed.2d 543 (1971) (plurality opinion) *Cf. United States v. Smith*, 621 F.2d 350, 351–2 (9th Cir.1980) *cert. denied*, 449 U.S. 1087, 101 S.Ct. 877, 66 L.Ed.2d 813 (1981) (finding consent where, after the

judge declared a mistrial but before he dismissed the jury, the judge and attorneys held a discussion in which retrial was anticipated and no objections were made to the mistrial).

Finally, when the judge declared a mistrial, he made no reference to Lovinger's earlier motion for a mistrial and did not state that it was declaring a mistrial at Lovinger's request or with his consent. *Cf. United States v. Crouch*, 566 F.2d 1311, 1315–6 (5th Cir.1978) (trial judge's statement that he declared mistrial at defendant's request is unreviewable).

Under the totality of the circumstances in the present case, Lovinger did not consent to the mistrial. He did move for a mistrial, but his motion was made four days before the mistrial was declared, and on different grounds. In declaring the mistrial, Judge Hoogasian did not refer to the earlier motion. Lovinger's position may have improved between the time of his motion for a mistrial and the court's declaration of a mistrial. He did not object to the declaration of a mistrial, but had no real opportunity to do so.

Accordingly, it is necessary to determine whether the mistrial was manifestly necessary.

### III. *Manifest Necessity*

A defendant may be retried after a mistrial to which he did not consent if the mistrial was "manifestly necessary." [3]

---

3. In *Richardson v. United States*, 468 U.S. 317, 326, 104 S.Ct. 3081, 3087, 82 L.Ed.2d 242 (1984), the Supreme Court held that a trial court's declaration of a mistrial following a hung jury does not terminate the defendant's original jeopardy, and consequently the double jeopardy clause does not bar retrial. This holding, however, does not bar all double jeopardy challenges to retrial following mistrial. The court's holding reflected the longstanding rule allowing retrial in such cases; it does not necessarily apply when the mistrial was declared for other reasons:

> The case law dealing with the application of the prohibition against placing a defendant twice in jeopardy following a mistrial because of a hung jury has its own sources and logic. It has been established for 160 years, since the opinion of Justice Story in *United States v.*

*Perez*, 9 Wheat. 579, 6 L.Ed. 165 (1824), that a failure of the jury to agree on a verdict was an instance of "manifest necessity" which permitted a trial judge to terminate the first trial and retry the defendant ... Since that time we have had occasion to examine the application of double jeopardy principles to mistrials granted for reasons other than the inability of the jury to agree ... Nevertheless, we have constantly adhered to the rule that a retrial following a "hung jury" does not violate the Double Jeopardy Clause.
Id. at 323–4, 104 S.Ct. at 3085.

The Court has recognized that in some circumstances a mistrial can bar reprosecution. Thus, in *Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984), the Court recognized that the double jeopardy clause requires that the defendant's original jeopardy terminate. *Id.* at 309, 104

*Washington, supra,* 434 U.S. at 505, 98 S.Ct. at 830 (1978). There are no rigid, mechanical formulas for determining whether a mistrial was manifestly necessary; the court must consider the particular facts in the case before it. *Illinois v. Somerville,* 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973). The trial court must make the initial determination of manifest necessity, and considerable deference is usually due its decision.[4] *Clauser, supra,* 731 F.2d at 426. Thus, the trial court need not make an express finding of manifest necessity, nor need it give the reasons for its decision. *Washington, supra,* 434 U.S. at 516–7, 98 S.Ct. at 835–36.

The trial judge must exercise his discretion soundly, however. *Jorn, supra,* 400

U.S. at 486–7, 91 S.Ct. at 557–58; *Washington, supra,* 434 U.S. at 514, 98 S.Ct. at 834. Moreover, although the trial judge need not state his reasons for declaring a mistrial, the presence of obviously adequate alternative remedies less harsh than mistrial militates against a finding of manifest necessity. *See Jones v. Hogg,* 732 F.2d 53, 56 n. 1 (6th Cir.1984); *United States v. Sanders,* 591 F.2d 1293, 1298 (9th Cir.1979); *United States v. Sartori,* 730 F.2d 973, 974–7 (4th Cir.1984); *Cf. Abdi v. State of Georgia,* 744 F.2d 1500, 1503 (11th Cir.1984) *cert. denied,* 471 U.S. 1006, 105 S.Ct. 1871, 85 L.Ed.2d 164 (1985) (manifest necessity for a mistrial can exist where there were less drastic alternatives, so long as the record shows that the trial court considered them before declaring mistrial).

S.Ct. at 1814, but also noted, citing *United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978), that the clause prohibits retrial after mistrial in some circumstances. *Id.* 466 U.S. at 307 n. 6, 104 S.Ct. at 1813 n. 6. *Scott* stated that such retrials are not barred when the mistrial was manifestly necessary. *Id.* at 92–3. *See also Illinois v. Somerville,* 410 U.S. 458, 461–3, 93 S.Ct. 1066, 1069–70, 35 L.Ed.2d 425 (1973); *Arizona v. Washington,* 434 U.S. 497, 505–14, 98 S.Ct. 824, 830–35, 54 L.Ed.2d 717 (1978); *United States v. Jorn,* 400 U.S. 470, 479–87, 91 S.Ct. 547, 554–58, 27 L.Ed.2d 543 (1971) (plurality opinion). *Richardson* cannot be read as creating a per se rule that retrial is not barred after mistrial; if there was no manifest necessity for the mistrial, retrial is ordinarily still barred. *See United States v. Jarvis,* 792 F.2d 767, 769 (9th Cir.1986).

Even when the trial court declares a mistrial on grounds of jury deadlock, double jeopardy challenges to retrial will not always be foreclosed. The defendant cannot argue that a mistrial because of a hung jury precludes retrial; he can, however, argue that the the jury was not deadlocked, and that the trial court abused its discretion in finding that it was. In such a case, *Richardson* would not apply, because the mistrial was in fact not declared because of a hung jury; consequently, in considering double jeopardy challenges to retrials after mistrials declared for jury deadlock, courts will examine whether the trial judge abused his discretion in declaring a mistrial. *See Walker v. Weldon,* 744 F.2d 775, 777–9 (11th Cir.1984); *Fay v. McCotter,* 765 F.2d 475, 477–8 (5th Cir.1985); *Cf. United States v. Brack,* 747 F.2d 1142, 1146, 1148 (7th Cir.1984), *cert. denied,* 469 U.S. 1216, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985) (defendant's first trial ended in hung jury; retrial therefore

not barred, but defendant apparently did not argue that the trial judge abused his discretion in declaring mistrial).

**4.** The degree of deference accorded to the trial judge's determination of manifest necessity depends at least in part on the degree of familiarity of the trial judge with the factors relevant to the determination. In cases of jury deadlock, or juror bias, greater deference is justified by the trial judge's greater familiarity with the facts. *Washington, supra,* 434 U.S. at 510 n. 28, 513–4, 98 S.Ct. at 832 n. 28, 834–35. However, the Court also stated that

the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused.

*Id.* at 508, 98 S.Ct. at 831 (footnotes omitted). This language suggests that where prosecutorial misconduct or conscious decisions, *see Downum v. United States,* 372 U.S. 734, 737–8, 83 S.Ct. 1033, 1035, 10 L.Ed.2d 100 (1963), cause the mistrial, the trial judge's determination of manifest necessity may be entitled to less deference. *Cf. Somerville, supra,* 410 U.S. at 459–60, 93 S.Ct. at 1068 (prosecutorial error in framing indictment resulted in manifest necessity for mistrial); *Clauser, supra,* 731 F.2d at 424–31 (police perjury of which prosecution was unaware, resulting in defective indictment, created manifest necessity for mistrial). In the present case, the mistrial was declared because of misconduct by the prosecutor; a lesser degree of deference may therefore be due the trial judge's (implicit) finding of manifest necessity for mistrial.

██ In the present case, the trial judge stated several reasons for declaring a mistrial. These were the three-year delay in bringing the case to trial, the lack of discovery afforded the defendant, the failure of the prosecution to comply with court discovery orders, and the prosecutor's conversation with Officer Bowden during a recess. Neither these reasons nor any other reasons apparent in the record created a manifest necessity for mistrial.

### Delay

Lovinger was arrested on October 16, 1979, and charged in January 1980 with delivering cocaine and cannabis. His trial began in November 1982. Conceivably this delay could have prejudiced Lovinger. Lovinger, however, apparently never objected to the delay. Even if there were prejudice, however, it is difficult to see how a mistrial followed by further delay would cure that prejudice.

### Discovery

The record reveals several instances arguably involving noncompliance or delay in obeying discovery charges. Any prejudice, however, was minimal. Thus, Judge Hoogasian ordered that Lovinger's expert be permitted to test all three bags of powder in People's Exhibit No. 2, but the expert was given only a sample drawn from one bag. R–60–1. When this fact was brought out, the court ordered that the expert be permitted to test all three bags, and the trial was continued until this was done. R–62–4. At another point, cross-examination of Officer Hutchings revealed that a log book was kept recording each time evidence entered and left the evidence room; this log book had not been specifically sought or requested in discovery. Judge Hoogasian granted a half-hour recess so that defense counsel could examine the log book and cross-examination then resumed. R–549–50. During the court's hearing on the prosecutor's conversation with Officer Bowden, it was revealed that Lovinger had not been given the police reports for October 5 and 10 during discovery. R–628–9.

Suppression by the State of exculpatory evidence material to guilt or punishment violates a criminal defendant's due process rights. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). Pretrial disclosure, however, is not required; the defendant's rights are violated only if "the disclosure came so late as to prevent the defendant from receiving a fair trial." *United States v. Sweeney*, 688 F.2d 1131, 1141 (7th Cir.1982) (quoting *United States v. McPartlin*, 595 F.2d 1321, 1346 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979)).

The discovery violations in the present case did not prevent Lovinger from receiving a fair trial. All the material was available for use in cross-examination of the prosecution's witnesses. If Lovinger needed more time to prepare for cross-examination a continuance could have been granted. *See United States v. Williams*, 738 F.2d 172, 178–9 (7th Cir.1984). In his declaration of a mistrial, Judge Hoogasian pointed to no harm resulting from the prosecution's failure to obey discovery orders promptly, and this court can perceive none.

### Conversations with Witnesses

██ A private conversation between a prosecutor and a State witness while the witness is testifying is not improper per se. *See* 23 CJS *Criminal Law* § 1025 (1961). Thus, where the defense counsel raised unexpected matters in his opening statement, the court did not commit error in permitting the prosecutor to speak privately with the government's first witness on the witness stand, although admonishing him not to discuss testimony the witness had already given. *United States v. Mandell*, 525 F.2d 671, 679 (7th Cir.1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 774, 46 L.Ed.2d 637 (1976). Such conversations do, however, create a potential for the prosecutor to influence the witness' testimony, and should be strictly scrutinized. Where the conversations are not authorized by the court and engaged in for some legitimate reason, but are in direct defiance of court

orders, the potential for prejudice to the defendant may be significant.

The prosecutor had two conversations with State witnesses. In the first conversation, during a recess after inconsistencies had developed in Officer Hutchings' testimony, the prosecutor looked over Hutchings' records and asked Hutchings to review them. The court found that although the conversation was improper, it would not taint Hutchings' testimony since he had been testifying from his records anyway, and the court therefore would not require that Hutchings' testimony be stricken or a mistrial declared. R–455–7. This finding is supported by the record; nothing indicates that Hutchings' testimony would have been altered by the conversation.

The second conversation was precipitated when during a recess the defense counsel asked the prosecutor for police reports for October 5 and 10. The prosecutor asked Officer Bowden, who had been testifying, for the reports; Bowden may have criticized Judge Hoogasian. R–623, 626, 628.

It is unlikely that Lovinger would have been prejudiced by this part of the conversation. Bowden had been testifying about the events of October 5 and 10. But the prosecutor did not review his testimony, or have him read the police reports; he merely asked him for the reports. It is difficult to see how this conversation could have influenced Bowden's testimony. It was as harmless as the earlier conversation, and would not justify a mistrial.

Bowden and the prosecutor, however, also may have discussed the procedures for using the key to the lockers outside the evidence room. After the recess, Lovinger testified that after hearing the earlier part of the conversation,

And I kind of strolled past. And when I strolled past again, I wasn't standing over there, standing listening. I heard something about the key to the evidence locker and I heard that being said

. . .

I heard [the prosecutor] Bowden's office about the key and the evidence locker. I didn't hear anything more than that. R–626–7.

Bowden testified that the conversation involved only the prosecutor's request for the police reports and Bowden's statement that he was displeased with the judge's criticisms of him. R–623. The prosecutor denied that he had any conversation with Bowden regarding the key or evidence locker. R–628. Judge Hoogasian did not make any express finding as to which version of the conversation was correct.

If this part of the conversation occurred, it might have resulted in significant prejudice to Lovinger. Bowden's testimony about the procedures involving the keys to the evidence lockers would be important in establishing the chain of custody of the substances obtained from Lovinger, and his testimony was inconsistent with Hutchings' earlier testimony about the procedures for using the lockers. The prosecutor's conversation with Bowden could have improperly influenced Bowden's future testimony and helped him resolve this conflict.

If he thought the conversation might have influenced Bowden's testimony, however, Judge Hoogasian had several options less severe than declaring a mistrial. He could have stricken Bowden's testimony in its entirety, or forbidden him to testify further, or allowed him to continue to testify, and stricken his testimony if it diverged from his earlier testimony so much that it would be reasonable to infer that the later testimony had been influenced by the conversation. Such actions would have preserved Lovinger's "valued right to have his trial completed by a particular tribunal," *Wade, supra*, 336 U.S. at 689, 69 S.Ct. at 837, while eliminating the potentially tainted testimony.

The presence of alternatives does not mean a mistrial was not manifestly necessary. The trial judge is granted considerable discretion in determining whether a mistrial is necessary, and if reasonable judges could differ and the record indicates that "the trial judge ... carefully con-

**1348**

sidered the alternatives and did not act in an abrupt, erratic or precipitate manner," his determination should be upheld. *Grandberry v. Bonner*, 653 F.2d 1010, 1014 (5th Cir.1981) (en banc); *see Abdi, supra*, 744 F.2d at 1503.

In the present case, Judge Hoogasian declared the mistrial abruptly and without considering alternatives. A mistrial would have been a reasonable option only if he credited Lovinger's version of the conversation; but Lovinger's version was vague, and he was within hearing range of the conversation only momentarily, and both parties to the conversation contradicted Lovinger's testimony. Any careful consideration of whether a mistrial was necessary would have had to begin with an attempt to resolve this conflicting testimony; but Judge Hoogasian made no such attempt. After a short recess following the conclusion of the mini-hearing on the conversation, he made a short statement about the problems that had occurred in the trial, declared a mistrial, and left the courtroom. He made no reference to possible alternatives to mistrial or to the potential double jeopardy problems of mistrial. *See Grandberry, supra*, 653 F.2d at 1015–6; *United States v. Starling*, 571 F.2d 934, 939–41 (5th Cir.1978). Under the circumstances of this case, where Judge Hoogasian acted abruptly and did not consider the alternatives to mistrial, the incident giving rise to the mistrial may not have occurred, and even if it did, there were adequate alternative remedies, the mistrial was not manifestly necessary. *See United States v. Sartori*, 730 F.2d 973, 975–7 (4th Cir.1984).

For the reasons stated above, Lovinger's petition for writ of habeas corpus should be granted.